# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHARMAYNE KIRKLAND,

        *Plaintiff*,

    v.

KEVIN McALEENAN, Acting Secretary of
the Department of Homeland Security,[1]

        *Defendant*.

Civil Action No. 13-194 (RDM)

## MEMORANDUM OPINION AND ORDER

Plaintiff Charmayne Kirkland brings this action against the Department of Homeland Security (the "Department") for allegedly violating the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 633a, and the Civil Service Reform Act of 1978, 5 U.S.C. § 1101 *et seq.*, by discriminating against her on the basis of race, sex, age, and disabilities; retaliating against her for requesting reasonable accommodations and for her prior Equal Employment Opportunity ("EEO") activity; and terminating her employment without good cause. After the completion of discovery, Plaintiff filed her third amended complaint. Dkt. 53. Plaintiff then moved for partial summary judgment on "several disability discrimination and failure to accommodate claims," Dkt. 57 at 1, and the Department cross-moved for summary judgment, Dkt. 61. After seeking and obtaining four extensions of time to respond to the Department's cross-motion, Plaintiff filed her opposition brief on January 11, 2019, Dkt. 66,

---

[1] Acting Secretary McAleenan is automatically substituted as the defendant pursuant to Fed. R. Civ. Pro. 25(d).

only to amend that submission a month later, Dkt. 70. The Department, in turn, sought and obtained an extension of time, Dkt. 74, and did not file its reply brief until May 3, 2019, Dkt. 77. Because briefing on the Department's cross-motion was thus delayed by several months, the Court issued a decision on Plaintiff's motion for partial summary judgment without waiting for the parties to complete briefing on the Department's cross-motion. Dkt. 75. Concluding that the "record reveal[ed] several genuine disputes of material fact," the Court denied Plaintiff's motion for partial summary judgment in March 2019. *See Kirkland v. Nielsen*, No. 13-194, 2019 WL 1428354, at *1 (D.D.C. Mar. 30, 2019) ("*Kirkland I*").

The Court now turns to the Department's cross-motion for summary judgment. Dkt. 61. In that motion, the Department argues: (1) that it complied with the Rehabilitation Act by accommodating Plaintiff, at least to the extent is was required to do so; (2) that it had legitimate, non-discriminatory reasons to terminate Plaintiff's employment and to take the other employment actions that Plaintiff alleges were based on unlawful discrimination or retaliation; (3) that Plaintiff cannot show that any of those rationales were pretextual; and (4) that Plaintiff was not subjected to a hostile work environment. Some of these arguments are persuasive, and others are not. The Court will, accordingly, grant in part and deny in part the Department's cross-motion for summary judgment.

## I. BACKGROUND

The following facts, except where indicated, are based on evidence either that Plaintiff offered or that the Department offered and that Plaintiff has failed to controvert with her own evidence. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In 1996, Plaintiff was hired as an industrial hygienist by the Immigration and Naturalization Service ("INS"), which was a component of the Department of Justice. *Kirkland*

*I*, 2019 WL 1428354, at *1.  When Congress abolished the INS in 2003, Plaintiff—along with other former INS employees—was temporarily reassigned to what was then called the Bureau of Immigration and Customs Enforcement in the newly-established Department of Homeland Security.  Dkt. 61 at 2 (SUMF ¶ 1); Dkt. 61-1 at 2 (Def. Ex. 1).  The Bureau of Immigration and Customs Enforcement is now known as U.S. Immigration and Customs Enforcement or ICE.  The next year, Plaintiff was again reassigned, this time to the Bureau of Customs and Border Protection—now known as U.S. Customs and Border Protection or CBP—in the Office of Human Resources, Workforce Effectiveness Division, Employee Support Safety and Health Branch ("Safety Branch").  Dkt. 61 at 2 (SUMF ¶ 2); Dkt. 61-1 at 4 (Def. Ex. 2).  For several months after her reassignment, Plaintiff continued to work from an office located at ICE headquarters but was eventually moved to an office at CBP headquarters located in Washington, D.C.  Dkt. 61 at 2 (SUMF ¶ 3); Dkt. 61-1 at 6 (Def. Ex. 3).  When the Department reassigned Plaintiff from ICE to CBP in January 2004, Gary McMahen, Director of the Safety Branch, became her direct supervisor.  *See* Dkt. 61-1 at 12 (Def. Ex. 4).  He served as her first-line supervisor until late March 2005, and then, later, her second-line supervisor.  *Id.*; Dkt. 57-6 at 67 (Pl. Ex. C).  Starting in January 2006, Mickey McKeighan served as Plaintiff's first-line supervisor.  *Id.*  Unlike Plaintiff, all other CBP industrial hygienists assigned to the Safety Branch worked from an office in Indianapolis, Indiana.  *See* Dkt. 61-1 at 69 (Def. Ex. 7).

On December 30, 2004, Plaintiff fractured her humerus in a non-work-related accident and, based on that injury, requested approval to telecommute.  Dkt. 61-1 at 19–20 (Def. Ex. 4).  While being treated for that injury, "her physician advised her that she suffered from carpal tunnel syndrome of the right and left arms."  Dkt. 57-6 at 61 (Pl. Ex. C); Dkt. 61-1 at 12 (Def. Ex. 4).  On or around January 28, 2005, Plaintiff provided CBP with a "verification of treatment"

form from her physician, stating that she had carpal tunnel syndrome ("bilateral, moderate to severe") and recommending that the Department provide her with "voice-activated software" and an "ergonomically correct workstation." Dkt. 57-6 at 29 (Pl. Ex. C); *see also* Dkt. 61-1 at 12, 14. The form indicated that Plaintiff's injury was work-related and that she had received medical treatment but did not describe the "physical effects or the projected duration" of the condition. Dkt. 61-1 at 12 (Def. Ex. 4); *see also* Dkt. 57-6 at 29 (Pl. Ex. C). On that same day, Plaintiff also provided CBP with a second "verification of treatment" form, dated February 2, 2005, which confirmed that she had fractured her right humerus in a non-work-related accident, Dkt. 57-6 at 30 (Pl. Ex. C), and which recommended that she be allowed to work from home until February 19, 2005, Dkt. 61-1 at 144 (Def. Ex. 13). Although the parties disagree about certain details, they agree that McMahen allowed Plaintiff to telework on a day-to-day basis during at least a portion of this timeframe. Dkt. 61 at 4 (SUMF ¶ 16); Dkt. 70 at 18 (Response to SUMF ¶ 16). On February 15, 2005, McMahen discontinued Plaintiff's telework arrangement and directed her to "either report to work or take leave." Dkt. 61-1 at 20–21 (Def. Ex. 4). That same day, Plaintiff contacted CBP's EEO Office about McMahen's action, but she indicated that she "did not wish to seek EEO counseling" at that time. Dkt. 57-6 at 60–61 (Pl. Ex. C).

According to Plaintiff, during a March 9, 2005 telephone call, she "emphatically ask[ed] for the voice-activated software [her] neurologist recommended," Dkt. 57-6 at 25 (Pl. Ex. C), and McMahen "assured" her that CBP would provide her with the "software[] and the ergonomic workstation" that she had requested, *id*. at 15. Plaintiff received the voice-activated software on or about July 1, 2005, *see* Dkt. 61-2 at 2 (Def. Ex. 18); Dkt. 61 at 3 (SUMF ¶ 10); Dkt. 70 at 16–17 (Response to SUMF ¶ 10), but she did not receive an "ergonomic chair" or operable telephone headset at that time, *see* Dkt. 61-1 at 114, 116, 131–32 (Def. Ex. 10, 12). Moreover,

although Plaintiff's training on how to use the software "began around July 1, 2005," *id.*, and, although she received some subsequent training, Dkt. 61-1 at 116 (Def. Ex. 10), the training was never completed, *see id.* at 239 (Def. Ex. 17) (noting, on May 25, 2007, that Kirkland "still ha[d] 4 hours of [voice activated software] training time left from 2005," which was incomplete because "she went out on leave"). With respect to Plaintiff's request for an ergonomic workstation, the Department conducted an initial ergonomic evaluation in May 2005, and a second ergonomic assessment in December 2005. *See* Dkt. 61-1 at 84 (Def. Ex. 8).

At the same time that Plaintiff was seeking accommodations for her carpal tunnel syndrome, the Safety Branch began the process of filling its position of Deputy Director, which was vacant. Prior to filling the position on a permanent basis, the Branch provided the opportunity for employees at the GS-13 or GS-14 grade level to serve as the acting Deputy Director for 30-day intervals. Dkt. 61-1 at 25 (Def. Ex. 4); Dkt. 61-2 at 5 (Def. Ex. 19). That opportunity presumably provided those applying to fill the position on a permanent basis with an advantage, since they would have relevant experience and could treat the temporary position as an audition for the permanent role. In April 2005, Kirkland applied for the "opportunity" to "showcase [her] abilities during one of the 30-day . . . intervals." Dkt. 61-2 at 5 (Def. Ex. 19). McMahen, however, denied the request, asserting that the acting Deputy Director position was available only to Indianapolis-based employees and that "[t]ravel expenses [would] not be authorized for employees outside the Indianapolis commuting area." Dkt. 61-2 at 5 (Def. Ex. 19). McKeighan, a fellow CBP industrial hygienist based in Indianapolis, was among those granted the opportunity to serve as the acting Deputy Director, and he was eventually appointed the permanent Deputy Director on January 22, 2006. Dkt. 61-1 at 77 (Def. Ex. 8).

On July 28, 2005, McKeighan, the then-acting Deputy Director, sent Plaintiff a letter "requesting more detailed information from her doctor regarding her medical" condition "to assist management in making an informed decision regarding whether or not [she] had a disability" requiring "a reasonable accommodation." Dkt. 57-6 at 79 (Pl. Ex. C); *see also* Dkt. 57-6 at 111–12. The CBP EEO Officer followed up in August 2005 by sending Plaintiff a memorandum seeking her doctor's written certification whether she was "able to perform the duties of [her] position and otherwise to meet its requirements." Dkt. 57-6 at 118–21 (Pl. Ex. C). In late September 2005, Plaintiff responded and provided CBP with a report, referred to as the EMG/Nerve Conducted Study ("EMG/NC Study"), and a letter from her neurologist, Dr. Daniel Glor. *Id.* at 122–27 (Pl. Ex. C). According to the EMG/NC Study, Plaintiff's results were "indicative of moderate carpal tunnel syndrome bilaterally, worse on the left," and her condition had "improved" since January 2005. *Id.* at 124 (Pl Ex. C). The study recommended that Plaintiff "be given an ergonomically-correct workstation and be allowed to use voice-activated software." *Id.* The Glor letter affirmed that Plaintiff suffered from "carpal tunnel syndrome bilaterally." Dkt. 57-6 at 126 (Pl. Ex. C). In response to specific questions posed by CBP, Dr. Glor opined that Plaintiff should "have an ergonomically correct workstation and [should] be allowed to use voice activated software in order to reduce the amount of keying she performs." *Id.* He further opined that "[t]he only major life activity from the list provided (walking, talking, eating, sleeping) that [Plaintiff's] carpal tunnel syndrome affects is sleeping, as sometimes the pain, numbness and tingling from the carpal tunnel syndrome can wake her from sleep." *Id.* He described the extent of Plaintiff's impairment as follows: her "carpal tunnel syndrome substantially limits her ability to work[] and may interfere with her sleep in a mild degree." *Id.*

McKeighan, who was serving as the acting Deputy Director at that time, responded to Plaintiff's request for a reasonable accommodation on November 7, 2005. Dkt. 61-2 at 2–3 (Def. Ex. 18). He started by explaining that CBP had, as a matter of "good faith," provided Plaintiff with voice-activated software and an ergonomic workstation as an accommodation "to assist [her] in performing the essential functions of [her] position." *Id.* at 2. But before CBP could decide whether Plaintiff was "entitled to an accommodation under the Rehabilitation Act of 1973," McKeighan continued, it had sought additional "medi[c]al information about [her] impairment." *Id.* McKeighan informed Plaintiff that, having received and reviewed that information, CBP had concluded that she did not "have an impairment that substantially limits a major life activity," as required to qualify for an accommodation under the Rehabilitation Act. *Id.*

Plaintiff, in turn, sought reconsideration and submitted "supplemental information from [her] physician." Dkt. 57-6 at 134–36 (Pl. Ex. C). In support of her request for reconsideration, Dr. Glor further opined that Plaintiff had "debilitating pain, numbness and tingling in her hands due to prolonged repetitive motions related to extensive keyboarding;" that "[t]he pain interrupts her sleep;" that "[t]he symptoms interfere with her ability to use a telephone, read, reach for objects, and do other hand/finger movements;" and that "the ability to use her hands, which is a major life function, is impaired." *Id.* at 135. Based on Plaintiff's condition, Dr. Glor recommended that she "do very limited keyboard activity;" recommended that she "accomplish her work through the use of voice activated software with a headset" and that she have "an adjustable chair;" and advised that she "cannot lift more than 5 pounds from no less then 24 inches from the floor, and no higher than shoulder height to avoid excessive strain to her arms, wrists, and hands." *Id.*

McMahen responded to Plaintiff's request for reconsideration on December 16, 2005 and concluded that she had failed to demonstrate that her carpal tunnel syndrome "substantially limit[ed] a major life activity." Dkt. 57-6 at 137 (Pl. Ex. C). He confirmed, however, that CBP had provided Plaintiff with "voice-activated software, an ergonomic chair and a modifiable workstation" and that it would continue to offer Plaintiff training on the use of the voice-activated software. *Id.* But McMahen informed Plaintiff, "no further accommodation is required." *Id.*

On February 22, 2006, CBP informed Plaintiff by letter that the Department had decided to "reassign [her] from [her] current position" as an industrial hygienist in "Washington, D.C. to the position of [i]ndustrial [h]ygienist . . . [in] Indianapolis, Indiana." Dkt. 61-2 at 15 (Def. Ex. 22). The letter explained that, "if you decline this reassignment, we will have no choice but to initiate action proposing your removal from federal service on the basis of your failure to accept this directed reassignment." *Id.* Although she asserts that she "was not given a meaningful choice," Dkt. 70 at 21 (Response to SUMF ¶ 29), Plaintiff does not dispute that she "accepted the direct reassignment . . . to Indianapolis" and that she "was given a reporting date of April 17, 2006," Dkt. 61 at 5 (SUMF ¶ 29); *see also* Dkt. 61-2 at 18 (Def. Ex. 22). Plaintiff's "voice-activated software and accessories[] were shipped to Indianapolis," but she "never reported for duty in Indianapolis." Dkt. 61 at 5 (SUMF ¶ 30); Dkt. 70 at 22 (Response to SUMF ¶ 30). Instead, on April 26, 2006—a little over a week after she was due to report—"Plaintiff requested that, as an accommodation, she be allowed to perform the [industrial hygienist] position in Washington, D.C., or, in the alternative," that she be allowed "to work a full-time telework schedule." Dkt. 61 at 5 (SUMF ¶ 31); Dkt. 70 at 22 (Response to SUMF ¶ 31).

According to Plaintiff, this accommodation was necessary because she was suffering from "degenerative joint disease and plantar fasciitis," and these conditions "severely restricted [her] ability to walk more than one quarter of a mile, ascend or descend more than three ten-inch steps, or climb or descend ladders, hills or slopes without experiencing physical pain or risking injury." Dkt. 57-1 at 3 (Pl.'s SUMF ¶¶ 7–8). As Plaintiff explained on April 26, 2006, the Safety Branch's office in Indianapolis was "not accessible to individuals," like her, "with walking disabilities using public transportation, making it effectively impossible for [her] to report to work." Dkt. 57-5 at 26 (Pl. Ex. B). Plaintiff asserts that the bus stop was located "across a busy interstate highway" from the Safety Branch's office, and, "[i]n the absence of sidewalks or walkways," she "would have to somehow traverse across three entrances to [the] highway" and a street "without the benefit of traffic lights." Dkt. 57-1 at 5–6 (Pl.'s SUMF ¶¶ 23–24). The walking distance from the bus stop to the office, moreover, was 0.8 miles. *Id.* at 6 (Pl.'s SUMF ¶ 25). The CBP EEO manager received a medical assessment from Plaintiff's doctors on June 9, 2006.[2] Dkt. 61-2 at 25 (Def. Ex. 24). An October 12, 2006 letter from her doctor confirmed that "[s]he is virtually unable to balance and walk without the use of a mobility aid such as a cane or a walker;" that, "even with the use of mobility aides, her ability to walk is impaired by at least 70%;" that she cannot "stand for more than 30 seconds without assistance;" and that "[s]he is unable to walk more than 100 yards, and she should not ascend or descend more than three ten-inch steps." Dkt. 57-5 at 27 (Pl. Ex. B). CBP granted Plaintiff a temporary

---

[2] Although that letter does not appear in the record, a July 10, 2006 letter to the EEO manager from Plaintiff's doctor indicated that Plaintiff was suffering from "a progressively degenerative arthritis and plantar fasciitis," carpal tunnel syndrome, and chronic low back pain, all of which "affect[ed] her ability to walk for extended periods of time" requiring "the use of adaptive aids," and advised that she "avoid prolonged walking, standing, climbing and sitting and" that she "limit lifting to less than 5 lbs." Dkt. 61-2 at 31–32 (Def. Ex. 25).

accommodation of leave without pay while the agency considered her request for a permanent accommodation.  Dkt. 61-2 at 25 (Def. Ex. 24).

Although it was Plaintiff's request for telework accommodation that precipitated the agency's assessment whether a reasonable accommodation was possible, the Department ultimately concluded that, regardless of where Plaintiff was located, she was "not qualified to perform the essential functions of the [i]ndustrial [h]ygienist position[,] with or without an accommodation."  Dkt. 61-2 at 24–29 (Def. Ex. 24).  On November 8, 2006, in a letter signed by McKeighan, the agency first concluded that Plaintiff had "a physical impairment that substantially limit[ed] [her] ability to perform the major life activit[ies] of walking, standing, climbing, sitting and lifting."  *Id.* at 28.  It further concluded that "no reasonable accommodation [was] available that would allow [her] to perform the essential functions of [her] Industrial Hygienist (GS 0690-13) position."  *Id.*  The letter explained:

> Your responsibilities as an Industrial Hygienist require[] you to be able to evaluate CBP, ICE and [other] work environments to determine existing or potential health risks.  The position description for the Industrial Hygienist [position] requires the incumbent to perform the full range of duties which include conducting environmental health and safety surveys inspections and programs that include asbestos removal, abatement and operation and maintenance programs; radon testing and remediation; indoor air quality testing and remediation; lead in water testing; hazardous materials handling; ergonomics; tuberculosis; blood borne pathogens; confined space entry; and the Hazard Communication Program.  The position also requires the incumbent to conduct these surveys and inspections at facilities such as laboratories, office buildings, Border Patrol checkpoints, border stations, warehouse[s], detention and removal facilities, aircraft and marine support facilities, inspection facilities at international airports, maintenance shops, radar and communication facilities, and firing ranges.  *The position is not sedentary in nature and requires frequent inspections and surveys which require moderate physical exertion, including walking, standing, bending, climbing and carrying many items of equipment used in sampling*.  In summary, your walking, standing, climbing, sitting and lifting restrictions preclude you from performing the essential functions of your position, either with or without reasonable accommodation.

*Id.* (emphasis added). Finally, the letter concluded that "the [a]gency's only option to reasonably accommodate [Plaintiff's] disability [was] to reassign [her] to a vacant-funded position" and that "the Office of Human Resources Management" would need to "assess [her] qualifications and [to] conduct a job search of vacant positions." *Id.*

On February 1, 2007, Plaintiff filed a new EEO complaint, alleging that CBP had discriminated against her based on her race, sex, age, physical disability, and also asserting a retaliation claim. Dkt. 61-3 at 259 (Def. Ex. 54); Dkt. 61 at 9 (SUMF ¶ 74). Two weeks later, on February 16, 2007, the Department offered Plaintiff a position as a Management Program Specialist ("MPS"), which she accepted on February 22, 2007. Dkt. 61 at 7 (SUMF ¶¶ 49–50). In the MPS position, Plaintiff's principal assignment was to administer CBP's webTELE system (the agency's automated telephone directory). *See* Dkt. 61-3 at 15–16 (Def. Ex. 39); *see also* Dkt. 61 at 8 (SUMF ¶ 62); *but see* Dkt. 70 at 26 (Response to SUMF ¶ 62) (objecting that Plaintiff was also "expected to carry files of paper weighing up to and above five pounds").

Soon after starting at the new MPS position, Plaintiff asserted that her commute to the office was beyond her medical limitations, and she requested permission to work from home. Dkt. 61 at 7 (SUMF Dkt. ¶ 52); Dkt. 70 at 23 (Response to SUMF ¶ 52); 61-3 at 19–20 (Def. Ex. 39). Her new supervisor, Jennifer Koh, denied that request on the ground that Plaintiff had just started in the position and needed training and supervision, but she indicated that she would reconsider the request in the future, after Plaintiff had "established [a] baseline on her performance or work delivered to measure her work." *Id.* at 20 (Def. Ex. 39); *see also* Dkt. 61 at 7 (SUMF ¶ 53). CBP did, however, deliver Plaintiff's voice-activated software, ergonomic keyboard, and footrest to her new MPS workstation. Dkt. 61-3 at 23 (Def. Ex. 40); Dkt. 61 at 7 (SUMF ¶ 55). On April 17, 2007, Plaintiff amended her EEO complaint. Dkt. 61-3 at 259 (Def.

Ex. 54). One month later, CBP once again began providing Plaintiff with training on the use of her voice-activated software, Dkt. 61-1 at 272 (Def. Ex. 17), although the parties disagree about the extent and efficacy of that training, *see* Dkt. 61 at 8 (SUMF ¶ 61); Dkt. 70 at 25–26 (Response to SUMF ¶ 61). Plaintiff, for her part, contends that none of the training was instructive on how to use the software with the webTELE system, which was her primary responsibility. Dkt. 70 at 25–26 (Response to SUMF ¶ 61).

On or about March 19, 2007, Koh assigned Plaintiff responsibility for developing a new user guide for the webTELE system. Dkt. 61-3 at 51 (Def. Ex. 41). When Koh followed up about the assignment over two months later, Plaintiff provided Koh with a single page document that contained handwritten bullet points. *Id.* at 39 (Def. Ex. 41). Koh provided Plaintiff with further instructions and a new deadline, but Plaintiff did not provide any additional work product for the assignment. *Id.* at 88 (Def. Ex. 41); Dkt. 61 at 9 (SUMF ¶ 66); Dkt. 70 at 26 (Response to SUMF ¶ 66). On June 11, 2007, Plaintiff sent Koh an email reiterating that she was suffering from "severe bilateral carpal tunnel syndrome;" that her neurologist had "advised that [she] not perform *any* writing/keyboarding[] until [she] [was] provided with voice recognition software, training on its use, and an ergonomic workstation;" and that, "irrespective of [her] *not* having completed training or having received further facilitation on the use of the" voice activated software, Koh and others unreasonably expected that she "complete each and every assignment" Koh had given her. Dkt. 61-3 at 152 (Def. Ex. 45); *see also* Dkt. 61 at 9 (SUMF ¶ 68). In light of her condition, Plaintiff refused to engage in any keyboarding to perform her duties. *See* Dkt. 61-3 at 179–80; Dkt. 61 at 9 (SUMF ¶ 68); Dkt. 70 at 26 (Response to SUMF ¶ 68).

Eventually, CBP analyzed Plaintiff's government-issued computer and email account, and the agency concluded that "she was able to send at least 500 typed emails" and to "modify

numerous documents on her government[-]provided computer account" during the same period that Plaintiff claimed that she was unable to perform any keyboarding in the performance of her duties. Dkt. 61 at 9 (SUMF ¶ 70). The Department has submitted spreadsheets and screenshots identifying emails that Plaintiff allegedly sent, or documents that she allegedly modified, Dkt. 61-3 at 122–48, 197–202, but Plaintiff objects to this evidence on the grounds that the Department has not submitted the emails themselves and has not authenticated the spreadsheets, Dkt. 70 at 27 (Response to SUMF ¶ 70). Although Plaintiff disputes the charges, *id.* (Response to SUMF ¶ 71), all agree that CBP proposed Plaintiff's removal on April 29, 2008, on the asserted grounds (1) that she "failed to fulfill the responsibilities of [her] position" and (2) that "[t]he statements [that she] made to management regarding [her] physical abilities were misleading and less than candid," Dkt. 61-3 at 204–05 (Def. Ex. 47); *see also* Dkt. 61 at 9 (SUMF ¶ 71). On September 5, 2008, Plaintiff was removed from federal service. Dkt. 61 at 9 (SUMF ¶ 72). The official who made the removal decision "determined that [Plaintiff] methodically resisted working, claim[ed] a physical limitation prevented her from performing her duties[,] [yet] simultaneously us[ed] the same abilities for other matters." *Id.*

Plaintiff filed the instant suit in 2013, alleging race, gender, disability, and age discrimination claims against the Department, *see* Dkt. 1 (Compl.), and, following discovery, she filed her third amended complaint in April 2018. *See* Dkt. 53 (Third Am. Compl.). In May 2018, Plaintiff sought partial summary judgment on her claims of disability discrimination only, and the Court denied that motion. *See Kirkland I*, 2019 WL 1428354, at *1. The Department's cross-motion for summary judgment, Dkt. 61, is now before the Court.

## II.  LEGAL STANDARD

As the movant, the Department bears the burden of showing "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Liberty Lobby*, 477 U.S. at 248; *see also Holcomb*, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).  In considering a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).  The non-movant's opposition, however, must consist of more than allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If that evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Liberty Lobby*, 477 U.S. at 249–50.

# III. ANALYSIS

Plaintiff's claims are sweeping but fall into five general categories: failure to accommodate, disparate treatment, retaliation, hostile work environment, and wrongful removal. Dkt. 53. The Department's motion for summary judgment, in turn, is almost as sweeping and addresses each of these categories, except Plaintiff's wrongful removal claims under the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1101 *et seq.* Because the Department's motion seeks summary judgment "on all of Plaintiff's claims," Dkt. 61 at 1, but says nothing about her claims under the CSRA, the Court will deny the motion with respect to Counts XV and XVI of Plaintiff's third amended complaint.[3] The Court addresses Plaintiff's remaining claims below.

## A.      Failure to Accommodate Claims

In Counts I, II, VII, VIII, IX, X, XI, XII, XIII, and XIV of the third amended complaint, Plaintiff alleges that the Department failed to accommodate her disabilities and, accordingly, violated the Rehabilitation Act, 29 U.S.C. § 791 *et seq.* Dkt. 53 at 28–35, 52–65 (Third Am. Compl. ¶¶ 176–224, 343–405). The Rehabilitation Act prohibits "the federal government from discriminating against employees on the basis of disability" and, among other things, establishes a cause of action against any federal agency that fails to grant a request for a reasonable accommodation. *Matos v. Devos*, 317 F. Supp. 3d 489, 496 (D.D.C. 2018) (citing 29 U.S.C. § 794). In evaluating whether an agency "unlawfully denied an accommodation," courts must "employ the standards of the Americans with Disabilities Act of 1990 [ADA], 42 U.S.C. § 12101 *et seq.*" *Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014); *see also* 29 U.S.C. § 791(f). This means that, to fend off a properly supported motion for summary judgment, a plaintiff must

---

[3] Because Plaintiff brings a "mixed case" asserting claims under the anti-discrimination laws and the CSRA, this Court has jurisdiction to consider both sets of claims. *See Perry v. Merit Sys. Protection Bd.*, 137 S. Ct. 1975, 1980, 1988 (2017).

"come forward with sufficient evidence to allow a reasonable jury to conclude that (i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability . . . ; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation . . . ; and (iv) her employer denied her request for a reasonable accommodation of that disability." *Solomon*, 763 F.3d at 9 (internal citations omitted).

Plaintiff contends that the Department failed to accommodate three distinct sets of impairments: (1) her degenerative joint disease, degenerative osteoarthritis, and plantar fasciitis; (2) her carpal tunnel syndrome; and (3) her fractured right humerus. The first set of impairments impeded her ability to walk and was a basis for the agency's determination that she was physically incapable of performing the essential functions of the industrial hygienist position. Dkt. 61-2 at 24–26 (Def. Ex. 24). As to that disability, the Department moves for summary judgment on the grounds that it lawfully concluded that Plaintiff could not perform the essential functions of the industrial hygienist position, with or without reasonable accommodations. Dkt. 61 at 33. The second asserted disability, her carpal tunnel syndrome, impeded Plaintiff's ability to type, use the telephone, lift objects weighing more than five pounds from below twenty-four inches or above shoulder height, and to engage in other, similar activity. Dkt. 57-6 at 135–36 (Pl. Ex. C.) As to that disability, the Department argues that it was not legally required to adopt any accommodations but that, in any event, it did reasonably accommodate her condition. Dkt. 61 at 18. Finally, Plaintiff's third asserted disability, her broken humerus, prevented her from driving and limited her mobility. Dkt. 61-1 at 143–44 (Def. Ex. 13). It did so, however, only for a limited time, and thus, according to the Department, did not fall within the coverage of the Rehabilitation Act. Dkt. 61 at 27. Because the analysis as to each set of disabilities differs, the Court will take each in turn.

1.  *Degenerative Joint Disease, Degenerative Osteoarthritis, and Plantar Fasciitis*

In Counts VII and VIII of the third amended complaint, Plaintiff alleges that the

Department failed to accommodate her degenerative joint disease, degenerative osteoarthritis,

and plantar fasciitis, conditions she was diagnosed with in 2004. Dkt. 53 at 52–57 (Am. Comp.

¶¶ 343–71). Although the crux of these claims arise from the Department's eventual decision to

disqualify her from the industrial hygienist position, that decision was precipitated by CBP's

decision to reassign Plaintiff from her position as an industrial hygienist in Washington, D.C. to

a position as an industrial hygienist in Indianapolis, Indiana. *See* Dkt. 61-2 at 15 (Def. Ex. 22).

Plaintiff contends that the reassignment posed an insurmountable hurdle for her: After reviewing

her options for commuting to work in Indianapolis, Plaintiff discovered that the closest bus stop

was located across a busy highway and almost a mile from the Safety Branch's Indianapolis

office. As a result, according to Plaintiff, the office was inaccessible to those who, like her, have

difficulty walking. *See* Dkt. 57-5 at 26 (Pl. Ex. B). A letter from Plaintiff's doctor, moreover,

confirmed that she was suffering from "a progressively degenerative arthritis and plantar

fasciitis" and other conditions, which prevented her from walking "more than 100 yards." Dkt.

*Id.* at 27 (Pl. Ex. B). Plaintiff, accordingly, requested reassignment back to Washington, D.C. or

a full-time telework schedule as an accommodation for her disability. Dkt. 61-2 at 22 (Def. Ex.

23).

Rather than grant either request, the Department determined that Plaintiff's asserted

disability precluded her from performing the essential functions of the industrial hygienist

position—with or without reasonable accommodations, from any work station—and it

accordingly initiated a process to find a vacant position to which to reassign her. Dkt. 61-2 at

27–29 (Def. Ex. 24). That process took several months to complete, and, during that interval,

Plaintiff was not paid. *See id.* at 29 (Def. Ex. 24) (noting that plaintiff was placed on "LWOP"—i.e., leave without pay); *id.* at 76 (Def. Ex. 32). In Plaintiff's view, the Department's actions violated the Rehabilitation Act in two respects: First, the agency should have allowed her to remain in her position as an industrial hygienist, with appropriate accommodations, *id.* at 52–57 (Third Am. Compl. ¶¶ 343–71), and, second, it should have more promptly placed her "in a vacant-funded position," *id.* at 57–58 (Third Am. Compl. ¶¶ 372–74).[4]

For purposes of these claims, the Department does not dispute that Plaintiff was disabled within the meaning of the Rehabilitation Act and that it had notice of her disability. *See* Dkt. 61 at 18. Rather, the Department's motion—and CBP's determination—focus solely on their view that Plaintiff was so severely disabled that she could not perform the "essential functions" of the industrial hygienist position, even with reasonable accommodation. *See Id.* at 31; 61-2 at 24–29 (Def. Ex. 24). Although neither the Rehabilitation Act nor the ADA defines the phrase "essential functions," the ADA—and, by cross-reference, the Rehabilitation Act—provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); 29 U.S.C. § 791(f). EEOC regulations define "essential functions" as "the fundamental job duties of the employment position," as distinct from "the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); *see also Adams v. District of Columbia*, 50 F. Supp. 3d 47, 54 (D.D.C. 2014); *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 660 (D.D.C. 1997). In addition to the "[w]ritten job description

---

[4] Count VII also includes allegations regarding Plaintiff's carpal tunnel syndrome, *see, e.g.*, Dkt. 53 at 54 (Third Am. Compl. ¶ 361), which are discussed below.

prepared" before the job was advertised, the Court may consider "[t]he employer's judgment as to which functions are essential," "[t]he amount of time spent on the job performing the function," the "terms of a collective bargaining agreement," "[t]he consequences of not requiring the incumbent to perform the function," and the "work experience of past incumbents in the job" and of "current . . . incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3). Physical presence is not invariably an essential function but, rather, requires a fact-intensive inquiry. *See Solomon*, 763 F.3d at 10.

"Generally, the question of what constitutes an essential function of a job is a factual issue to be determined by a jury," *Hancock v. Wash. Hosp. Ctr.*, 13 F. Supp. 3d 1, 5 (D.D.C. 2014); *see also Baker v. Potter*, 294 F. Supp. 2d 33, 44 (D.D.C. 2003), and this case fits neatly within that paradigm. According to the Department, the "essential function[s] of the [industrial hygienist] position" included conducting "health and safety surveys and inspections" at "facilities such as laboratories, office buildings, [and] Border Patrol checkpoints . . . ." Dkt. 61 at 5 (SUMF ¶ 34). The need to conduct these inspections, in the Department's view, means that the industrial hygienist "position is not sedentary" and, instead, requires "moderate physical exertion, including walking, standing, bending, climbing and carrying many items of equipment used in sampling." *Id*. at 5–6 (SUMF ¶ 35). In support of this characterization, the Department offers written job descriptions from 1996 and 2005, which list these physical demands, Dkt. 61-1 at 55–60 (1996 job description); Dkt. 44-3 at 155–59 (2005 job description), and a copy of Plaintiff's resume, which includes "conducting studies, inspections and surveys" among the duties she performed as an industrial hygienist, Dkt. 61-2 at 51 (Def. Ex. 28).

Plaintiff disputes the Department's characterization of the physical demands of the industrial hygienist position. She claims that "[w]alking, standing, bending, climbing, carrying

equipment and other forms of moderate physical exertion were never essential functions" of the position. Dkt. 70 at 22 (Response to SUMF ¶ 34). In support of this contention, Plaintiff relies on the deposition of James Britt, a fellow CBP industrial hygienist, who testified that activities "requiring mild to moderate physical exertion," such as "carrying equipment" or "collecting samples," was "an exceptional thing." Dkt. 44-8 at 12 (Pl.'s Ex. H). Britt further testified that the CBP industrial hygienists "didn't even have the equipment to go out and do sampling and stuff," *id.*, and that "for the most part," when "people are out in the field carrying equipment, walking, standing, lifting," the work was "performed by Federal Occupational Health" employees, *id.* at 11. Plaintiff also notes that, when she accepted the industrial hygienist position at the INS in 1996, the position description characterized the "physical demands" of the job as "primarily sedentary in nature" and that, only later, did CBP amend the position description (erroneously, in her view) to refer to "moderate physical exertion." Dkt. 57-1 at 4 (Pl.'s SUMF ¶ 14); Dkt. 44-3 at 151. The 1996 position description, to be sure, also states that an industrial hygienist "may occasionally conduct field surveys requiring a moderate degree of physical activity." Dkt. 44-3 at 151. But, the position description—and, more importantly, Britt's testimony—show that field inspections and surveys were, at most, "marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

Plaintiff's evidence, like the Department's, is probative of whether "moderate physical exertion, including walking, standing, bending, climbing and carrying . . . equipment used in sampling," Dkt. 61 at 5–6 (SUMF ¶ 35), was, in fact, an essential function of the industrial hygienist position. The parties' conflicting accounts create a genuine dispute of material fact, and resolution of that dispute is a question for the factfinder at trial and not for the Court at the summary judgment stage of the proceeding. *See Baker*, 294 F. Supp. 2d at 44; *Hancock*, 13 F.

Supp. 3d at 5.  The Court will, accordingly, deny the Department's motion for summary judgment with respect to Counts VII and VIII.

      2.     *Carpal Tunnel Syndrome*

Plaintiff alleges that CBP failed to accommodate her carpal tunnel syndrome in multiple respects.  CBP failed, according to Plaintiff, (1) promptly to provide her with voice-assisted software; (2) promptly to provide her with training on use of the software and to complete that training; (3) promptly to provide an ergonomic workstation; (4) to provide her with a typist to take dictation; (5) to provide her with equipment permitting her to switch her headset from word processing to the telephone; or (6) to assist her in unpacking her boxes after she moved offices. *See* Dkt. 57 at 1; *see also* Dkt. 53 at 32, 58, 61–63.  In the Department's view, each of these claims is deficient for two reasons—first, because Plaintiff has failed to offer evidence that would permit a reasonable jury to find that her carpal tunnel syndrome constituted a disability under the Rehabilitation Act (or that her employer was on notice of that disability), and, second, because CBP, in any event, reasonably accommodated her impairment.  In *Kirkland I*, the Court reserved the question whether Plaintiff's carpal tunnel syndrome constituted a disability for purposes of the Rehabilitation Act.  2019 WL 1428354, at *4 n.2.  The Court now turns to that question.

All of the events relevant to this action occurred on or before September 5, 2008.  Dkt. 53 at 28 (Third Am. Compl. ¶ 175).  Three weeks after that date, Congress enacted the ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008).  That sequence is pivotal because the ADA Amendments Act changed the law in material respects, but the Act did not take effect until January 1, 2009, Pub. L. 110-325, § 8, 122 Stat. 3553, 3559 (2008), and it applies only prospectively, *see Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 940–42 (D.C.

Cir. 2009).  Prior to enactment of the ADA Amendments Act, the construction of the phrase

"qualified individual with a disability" in the ADA—and, by implication, for purposes of the

Rehabilitation Act—was controlled by the Supreme Court's decision in *Toyota Motor*

*Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002).  That standard is dispositive for

present purposes.

Prior to enactment of the ADA Amendments Act, the ADA defined "disability," in

relevant respects, as "'a physical or mental impairment that substantially limits one or more

major life activities of [an] individual." 42 U.S.C. § 12102(1)(A) (2008).  In *Williams*, the

Supreme Court construed this statutory text in light of the regulations interpreting the

Rehabilitation Act and, to a lesser extent, the EEOC regulations interpreting the ADA.  534 U.S.

at 193–94.  The Court focused on two statutory terms—the requirements that the impairment at

issue "substantially" limit the "major" life activities of the individual.  *Id.* at 196–97.  Those

terms, in the Court's view, imposed "a demanding standard for qualifying as disabled."  *Id.* at

197.  The term "substantially" excluded "impairments that interfere[d] in only a minor way with

the performance"—as relevant there and here—"of manual tasks," and the term "major" limited

the meaning of "disability" to impairments that interfered with "those activities that are of central

importance to daily life," such as "walking, seeing, and hearing" and "manual tasks" of similar

centrality "to daily life."  *Id.*   In short, under the (now-defunct) *Williams* standard, "an

individual must have [had] an impairment that prevent[ed] or severely restrict[ed] [her] from

doing activities that [were] of central importance to most people's daily lives," and that

"impairment's impact must also [have been] permanent or long term."  *Id.* at 198.

Of particular importance here, the Supreme Court also held that a plaintiff "attempting to

prove disability status" must do more than "merely submit evidence of a medical diagnosis of an

impairment" and must, instead, "'prove a disability by offering evidence that *the extent of the limitation* [caused by her impairment] in terms of [her] own experience [was] *substantial*.'" *Id.* (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)) (emphasis added). This, in turn, required a "case-by-case" assessment of the effect of the impairment on the plaintiff's life. *Id.* Such an "individualized assessment of the effect of [the] impairment," moreover, was "particularly necessary when the impairment [was] one" with symptoms that "var[ied] widely from person to person," such as "[c]arpal tunnel syndrome." *Id.* at 199. For this reason, under the *Williams* standard, "an individual's carpal tunnel syndrome diagnosis, on its own," was insufficient to prove a disability, *id.*, as was evidence that the individual was unable "to perform manual tasks associated only with her job," *id.* at 200. Finally, the Court held that an impairment causing the plaintiff "to avoid sweeping, to quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances . . . did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law." *Id.* at 202.

Before enactment of the ADA Amendments Act, numerous judicial decisions held—albeit on a case-by-case basis—that carpal tunnel syndrome did not constitute a disability under the ADA or the Rehabilitation Act because it did not "substantially limit[] one or more [of the] major life activities of [an] individual," 42 U.S.C. § 12102(1)(A) (2008 ed.). *See Cutler v. Hamden Bd. of Educ.*, 150 F. Supp. 2d 356, 358 (D. Conn. 2001) (collecting cases and noting that this conclusion had "been reached by virtually every . . . court which ha[d] considered the issue"); *see also West v. Port Auth. of N.Y. and N.J.*, No. 00-6711, 2002 WL 31027016, at *4 (S.D.N.Y. Aug. 30, 2002); *Mikell v. Waldbaum, Inc*., No. 02-1501, 2003 WL 21018844, at *5 (S.D.N.Y. May 5, 2003); *Benge v. Gen. Motors Corp*., 267 F. Supp. 2d 794, 802 (S.D. Ohio

2003); *Kriegsmann v. FWC Residential Co*., No. 05-2534, 2007 WL 9747428, at *7 (D. Md. Sept. 4, 2007).

In the Department's view, this substantial body of pre-2009 case law shows that carpal tunnel syndrome did not constitute a disability under the *Williams* standard. Dkt. 79 at 2. But that is not quite right; *Williams* did not announce such a categorical rule. The Supreme Court, to the contrary, stressed that courts were required to take a case-by-case approach in determining whether an impairment constituted a disability, and, indeed, the Court recognized that the symptoms of carpal tunnel syndrome "vary widely." *Williams*, 534 U.S. at 199. What the pre-2009 case law does show, however, is that the *Williams* standard was "demanding" and that, to survive a motion for summary judgment, a plaintiff was required to do more than offer evidence of a diagnosis, restrictions on her ability to perform certain job-related tasks, or unquantified limitations on major life activities. *Id.* at 197. The crux of the issue, therefore, is whether Plaintiff has offered evidence sufficient to permit a reasonable jury to find that her carpal tunnel syndrome "severely restrict[ed]" her "from doing activities that are of central importance to most people's daily lives" and that the "impairment's impact" was "permanent" or "long[-]term." *Id.* at 198. In the Department's view, Plaintiff failed to make this showing when she sought an accommodation, and she has failed to make that showing in opposing the pending motion for summary judgment. Dkt. 77 at 3. As explained below, the Court agrees.

Plaintiff first sought an accommodation for her carpal tunnel syndrome in late January or early February 2005, when she submitted a verification of treatment form from her physician. Dkt. 57-6 at 29; *see also* Dkt. 57-1 at 3 (SUMF ¶ 9); Dkt. 61-1 at 12, 14. That form merely reported that Plaintiff had received medical treatment for "moderate to severe" bilateral carpal tunnel syndrome and recommended that CBP provide her with "voice-activated software and

[an] ergonomically correct work station." Dkt. 57-6 at 29. Neither Plaintiff's "medical diagnosis of an impairment" nor her doctor's recommended accommodation constituted "evidence that the extent of the limitation [caused by her impairment] in terms of [her] own experience [was] substantial" *Williams*, 534 U.S. at 199 (second quote quoting *Albertson's, Inc.*, 527 U.S. at 567), or that it restricted her from engaging in any major life activities. Likewise, Plaintiff's complaints over the next several months about CBP's failure to move with sufficient speed in implementing the accommodations that she sought, and her physician's contemporaneous recommendation that she remain on "restricted duties due," in part, to her "carpal tunnel syndrome," Dkt. 57-6 at 12 (Pl. Ex. C), did not satisfy the *Williams* standard.

In light of this evidentiary shortfall, on July 28, 2005, CBP asked Plaintiff to obtain additional information from her doctor about her impairment, including "[a]n explanation of the impact of the medical condition on [her] overall health and activities." Dkt. 57-6 at 111–12 (Pl. Ex. C). CBP followed up three weeks later with a request for additional information and, even more to the point, asked that Plaintiff's physician address (1) whether her impairment affected "any major life activities," such as "walking, talking, eating, sleeping, etc.;" (2) if so, "whether th[at] limitation [was] substantial;" and (3) "[h]ow long the impairment [was] expected to last." *Id*. at 118–121. In response, Plaintiff offered the EMG/NC Study and a letter from Dr. Daniel Glor. Dkt. 57-6 at 122–27. Neither document, however, offered evidence that would permit a reasonable jury to find that Plaintiff's impairment substantially limited her ability to engage in any major life activities, as that standard was explicated in *Williams*. Both the EMG/NC Study and Dr. Glor's letter merely affirmed the diagnosis of carpal tunnel syndrome. Only two activities were discussed in EMG/NC Study. The study first asserted that Plaintiff stated that "her symptoms are worse with prolonged keyboarding." Dkt. 57-6 at 123 (Pl. Ex. C). But,

under the *Williams* standard, "manual tasks unique to any particular job are not necessarily" sufficient, 534 U.S. at 201, and, in any event, the study referred only to "prolonged" keyboarding and thus failed to establish that Plaintiff's impairment "severely restrict[ed]" even that work-related activity, *id*. at 198, 200. And, with respect to the second activity mentioned in the report—sleep—the study concluded that Plaintiff's symptoms did "*not* actually wake her at night." Dkt. 57-6 at 123 (Pl. Ex. C).

Dr. Glor's letter, likewise, failed to identify any major life activity that Plaintiff's carpal tunnel syndrome severely restricted. Dkt. 57-6 at 126–27 (Pl. Ex. C). To the contrary, apart from "occupation-specific tasks," which "may have only limited relevance to the manual task inquiry," *Williams*, 534 U.S. at 201, it merely asserted that Plaintiff's carpal tunnel syndrome "sometimes" caused "pain, numbness and tingling" that "can wake her from sleep." *Id.* at 126. The letter added, however, that any interference with her sleep was "mild." Dkt. 57-6 at 126 (Pl. Ex. C). Thus, even though sleep is a major life activity, *see Desmond v. Mukasey*, 530 F.3d 944, 953–55 (D.C Cir. 2008), no reasonable jury could find—based on the EMG Study, the Glor letter, or any other evidence in the record—that Plaintiff's impairment "severely restrict[ed]" that activity, as required under the *Williams* standard, 534 U.S. at 198.[5] Rather, whether measured against "either an individualized or a generalized benchmark," a plaintiff must "offer more than . . . allegations of restless or fitful sleep, or occasional, temporary bouts of sleeplessness." *Desmond*, 530 F.3d at 956. At most, however, the EMG Study and the Glor letter showed that Plaintiff's carpal tunnel syndrome interrupted her sleep with unspecified frequency for

---

[5] If a mild interference with one's sleep were sufficient to establish a disability, far more than the 43 million Americans that Congress identified as "disabled" when it enacted the ADA, 42 U.S.C. § 12101(a)(1), *see also Williams*, 534 U.S. at 197, would have made that list.

unspecified lengths of time and that this impairment was "mild." As a matter of law, more is required to support a claim under the Rehabilitation Act.

After CBP concluded that this evidence was insufficient to trigger protection under the pre-ADA Amendments Act version of the Rehabilitation Act, Dkt. 57-6 at 130–31 (Pl. Ex. C), Plaintiff sought reconsideration, and she offered a supplemental letter from Dr. Glor, Dkt. 57-6 at 134–36. That letter, at first glance, seems to come closer to satisfying the *Williams* standard. It asserted that Plaintiff's carpal tunnel syndrome "interrupt[ed] her sleep" and "interfere[d] with her ability to use a telephone, read, reach for objects, and do other hand/finger movements." *Id.* at 135. The problem with these assertions, however, is that the letter, once again, says nothing about the severity—or substantiality—of these impairments. We know from Dr. Glor himself, for example, that any interference with Plaintiff's sleep was "mild," and we know that he otherwise declined to "specify a particular percentage" identifying the substantiality of the "limits" or restrictions on Plaintiff's ability to work. Dkt. 57-6 at 126 (Pl. Ex. C). What Dr. Glor did say about Plaintiff's "ability to work," moreover, is "described in [his] EMG/NC reports," *id.*, and the EMG/NC Study that Plaintiff provided CBP and the Court states only that her "symptoms are worse with prolonged keyboarding," *id.* at 123—not that Plaintiff was wholly (or even substantially) unable to "reach for objects" or to use her hands or fingers. But, without any evidence identifying *the extent to which* Plaintiff's impairment restricted her ability to engage in major life activities, no reasonably jury could find that she suffered from a disability within the meaning of the Rehabilitation Act or, even more to the point, that CBP was on reasonable notice that she suffered from such a disability. *See Solomon*, 763 F.3d at 9 (stating that in order for a plaintiff to prove an accommodation claim the employer must have notice of the disability); *see also Hayes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004) (plaintiff must offer medical

evidence or personal testimony identifying the extent to which the impairment limits her ability to engage in a major life activity to survive summary judgment).

Plaintiff points to one final impairment, which she contends supports her claim and provides a basis to deny the Department's motion for summary judgment. In his supplemental letter, Dr. Glor asserted that Plaintiff "cannot lift more than 5 pounds from . . . less than 24 inches [above] the floor" or from about "shoulder height to avoid excess strain to her arms, wrists, and hands." Dkt. 57-6 at 135 (Pl. Ex. C). According to Plaintiff, this lifting restriction shows that her carpal tunnel syndrome "compromised the major life activity of lifting." Dkt. 70 at 4. Relying on *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1241–42 (10th Cir. 2001), Plaintiff further asserts that the lifting restriction is substantially limiting on its face and, accordingly, that she need not provide "comparator" evidence—that is, evidence about how the lifting restriction restricts a major life activity relative to the capabilities of the average person. *See* Dkt. 66 at 2 n.2 (citing *Lusk*, 238 F.3d 1237). Plaintiff's assertion that the lifting restriction, standing alone, is sufficient to establish that she was disabled fails for two reasons.

First, Plaintiff's reliance on *Lusk* is misplaced. *Lusk* is neither binding precedent in this jurisdiction, nor consistent with the governing Supreme Court precedent. *Lusk* was decided prior to *Williams* and, importantly, its categorical approach cannot be squared with *Williams*. The post-*Williams* case law illustrates this point. Although at least one Tenth Circuit decision continued to follow *Lusk* after *Williams* was decided, *see Velarde v. Associated Reg'l & Univ. Pathologists*, 61 F. App'x 627, 630 (10th Cir. 2003) (recognizing that *Williams* requires a case-by-case approach; affirming its holding in *Lusk* that a fifteen-pound lifting restriction is "substantially limiting on its face"; but refusing to extend *Lusk* to a twenty-five-pound lifting restriction), every other circuit that considered the question concluded that a lifting restriction,

standing alone, was insufficient to satisfy the major-life-activity standard. *See, e.g.*, *Prescott v. Higgins*, 538 F.3d 32, 44 (1st Cir. 2008) (noting that "limitations on lifting, without more, are not a substantial limitation on a major life activity"); *Cortes v. Sky Chefs, Inc.*, 67 F. App'x 66, 68 (2d Cir. 2003) (affirming a district court's holding that a doctor's notes restricting the plaintiff from lifting more than ten pounds was insufficient, by itself, to establish "a substantial limitation on a major life activity"); *Cella v. Villanova Univ.*, 113 F. App'x 454, 455 (3d Cir. 2004) (acknowledging that a ten-pound lifting restriction, standing alone, "does not establish that [an] impairment substantially limits a major life activity"); *Gerton v. Verizon S. Inc.*, 145 F. App'x 159, 166 (6th Cir. 2005) (holding that a five-pound lifting restriction was not enough to establish a disability under *Williams* where the plaintiff had "not presented any evidence to show that the inability to lift [that] amount substantially limit[ed] her ability to lift anything else she requires in her daily life outside work"); *Mays v. Principi*, 301 F.3d 866, 869 (7th Cir. 2002) (expressing "doubt" that a ten-pound lifting restriction is a major life activity under *Williams*). The Court concludes that the majority approach is consistent with *Williams*. Under *Williams*, the existence of a disability required an "individualized assessment," 534 U.S. at 198, and, accordingly, a plaintiff was required to offer evidence that her inability to lift certain objects substantially limited her ability to engage in a major life activity.

Second, Plaintiff has not submitted sufficient evidence to raise a genuine issue of material fact that her impairment limited her in a major life activity. The sole evidence that Plaintiff relies on, Dr. Glor's assessments, does not show that she was unable to lift more than five pounds. Dr. Glor said only that she should not lift objects of five pounds or more from a low elevation (24 inches from the floor) or a high elevation (above her shoulders) in order "to avoid excessive strain to her arms, wrists, and hands." Dkt. 57-6 at 135 (Pl. Ex. C). Moreover, and

more importantly, Plaintiff never explains how this lifting restriction affected her daily life—or prevented her from doing activities that are of central importance to most people's daily lives. Plaintiff had multiple opportunities to provide both CBP and the Court with such evidence, yet she failed to do so. Because she has not proffered *any* evidence that would permit a reasonable jury to find that her carpal tunnel syndrome "severely restrict[ed]" her ability to engage in "activities that are of central importance to most people's daily lives," *Williams*, 534 U.S. at 198, 201, Plaintiff's contention that CBP failed to accommodate her carpal tunnel syndrome under the Rehabilitation Act fails as a matter of law. [6]

Finally, Plaintiff takes a different tack, arguing that she has satisfied the "regarded as" prong of the statutory test. Under the pre-ADA Amendments Act version of the ADA, a disabled individual was defined to include an individual with "a physical or mental impairment that substantially limits one or more of the major life activities of [the]" plaintiff, or an individual "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(C) (2008).[7] To qualify as disabled under that prong, Plaintiff must show more than that she was "regarded as having an

---

[6] Plaintiff also asserted in her motion for summary judgment, Dkt. 57-2, which the Court has already denied, Dkt. 75, that Plaintiff was "unable to brush or style her hair." *See* Dkt. 57-2 at 34. But that assertion is unsupported by any evidence, and, in any event, fails to satisfy the "demanding" *Williams* standard. *See Williams*, 534 U.S. at 202 (noting that restrictions on "sweeping" and "dancing" and the need "to occasionally seek help dressing" "did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law").

[7] The ADA Amendments Act added a new subsection defining "being regarded as having such an impairment." 42 U.S.C. § 12102(3). Prior to enactment of the ADA Amendments Act, the circuits were split on the question whether the ADA's reasonable accommodation requirement applied to the "regarded as" prong of the statutory test. *See, e.g.*, *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1234–35 (11th Cir. 2005) (describing circuit split). Under the current version of the ADA, the "regarded as" prong applies only "if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3).

impairment of some sort." *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 84 (D.D.C. 2009) (quoting *Adams v. Rice*, 531 F.3d 936, 942 (D.C. Cir. 2008)). She must also show that her "employer 'mistakenly believe[d] that [she] ha[d] a physical impairment that substantially limit[ed] one more major life activities' or 'mistakenly believe[d] that an actual, nonlimiting impairment substantially limit[ed] one or more major life activities.'" *Adams*, 531 F.3d at 945 (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)); *see also Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22 (1999); *Hayes*, 392 F.3d at 481 n.2. Although CBP did agree to accommodate Plaintiff's impairment by providing her with voice-activated software and an ergonomic workstation, Plaintiff has failed to offer any evidence that CBP ever concluded or believed that her impairment "substantially limit[ed] one or more . . . major life activities." *Adams*, 531 F.3d at 945 (quoting *Sutton*, 527 U.S. at 489). Those courts that have considered the question, moreover, have uniformly held that an employer's voluntary provision of an accommodation does not, standing alone, show that the employer regarded the employee as disabled for purposes of the ADA or Rehabilitation Act. *See, e.g.*, *Kupstas v. City of Greenwood*, 398 F.3d 609, 614 (7th Cir. 2005); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 776 (3d Cir. 2004); *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 798 (9th Cir. 2001); *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000); *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 659 (D.D.C.), *aff'd. Kalekiristos v. C.T.F. Hotel Mgmt. Corp.*, 132 F.3d 1481 (D.C. Cir. 1997). That approach is both logically sound and prudent since it avoids creating a disincentive to the prompt provision of accommodations. As a result, Plaintiff cannot plausibly rely on the "regarded as" prong of the statutory test.[8]

---

[8] Although not raised in this round of briefing, the Court also rejects Plaintiff's previously asserted "collateral estoppel" argument. *See* Dkt. 52-2 at 26–29. Contrary to Plaintiff's argument, the determination of the U.S. Department of Labor Employees' Compensation

Because the record contains no evidence that would permit a reasonable jury to find that Plaintiff's carpal tunnel syndrome satisfied the stringent *Williams* standard, the Court will grant the Department's motion for summary judgment as to Counts II, IX, X, XI, XII, XIII, and XIV.

### 3. *Fractured Humerus*

Finally, Plaintiff contends that CBP failed to permit her to work from home from January 23, 2005 to February 5, 2005 in violation of the Rehabilitation Act. Although Plaintiff suggests that her request to work from home would have also permitted her "to recuperate more rapidly" from her carpal tunnel syndrome, Dkt. 53 at 30 (Third Am. Compl. ¶ 192), the thrust of this claim—and the recommendation from her doctor, Dkt. 57-6 at 1—focuses on the fracture she sustained to her right arm in a car accident in December 2005, Dkt. 53 at 29–31 (Third Am. Compl. ¶¶ 184–202). As Plaintiff concedes, her request for accommodation was for "a temporary condition of a fractured humerus." *See* Dkt. 61 at 4 (SUMF ¶ 15); Dkt. 70 at 18 (Response to SUMF ¶ 15). The Rehabilitation Act, however, covers only "permanent or long[-]term" impairments, *Williams*, 534 U.S. at 198, and does not cover an impairment, like the fracture to Plaintiff's arm, that "lasted for only several weeks," *Adams*, 531 F.3d at 947. Because CBP, accordingly, was not required to provide an accommodation for that impairment, the Court will grant the Department's motion for summary judgment as to Count I.[9]

---

Appeals Board ("ECAB") that her carpal tunnel syndrome was a "permanent disability," *id.* at 26, is not binding in this action. The ECAB enforces a different statute—the Federal Employees' Compensation Act—and it uses a different standard for finding "disability" than the *Williams* standard. *See Andreoli v. Gates*, 482 F.3d 641, 651 (3rd Cir. 2007); *see also Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. App'x. 1630, § 1630.1(c) (noting that the definition of "disabled" under ADA is not identical to other programs, such as "[f]ederal disability benefit programs," because such programs "have fundamentally different purposes").

[9] Although Count I also refers in passing to Plaintiff's carpal tunnel syndrome, even had Plaintiff sought permission to work from home as an accommodation for her carpal tunnel

**B.     Disparate Treatment and Retaliation Claims**

      1.     *Disparate Treatment Claims*

In Count III of her third amended complaint, Plaintiff alleges that CBP discriminated against her on the basis of her race, gender, and disability.  In that single count, she refers to at least a dozen incidents that occurred during her time at CBP, including that CBP: (1) assigned her tasks requiring extensive keyboarding, including typing weekly reports; (2) denied her opportunities for training; (3) denied her opportunities for promotion, including precluding her from competing for the position of acting Deputy Director; (4) excluded her from participating in meetings pertinent to her areas of responsibility; (5) denied her request to participate in a volunteer detail to FEMA; (6) denied her the opportunity to attend a briefing on the avian flu; (7) denied her request for telework accommodations; (8) failed to recognize her union rights; (9) reassigned her to the Indiana office of the Safety Branch; (10) denied her request to be placed on a paid leave pending her reassignment; (11) denied her requests for official time to work on her EEO complaint; and, finally, (12) removed her from federal service in 2008.  *See* Dkt. 53 at 35–39 (Third Am. Compl. ¶¶ 225–48).  For the reasons explained below, the Court will grant Defendant's motion for summary judgment as to Count III.

Disparate treatment claims, including those brought under Title VII and the Rehabilitation Act, implicate the familiar burden-shifting framework the Supreme Court set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See also McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000) (*McDonnell Douglas* framework applies to claims brought under

---

syndrome, Count I would still fail for the reasons explained above.  Plaintiff's references to her degenerative joint disease, osteoarthritis, and plantar fasciitis in Count I do not affect the Court's analysis either.  To the contrary, Plaintiff expressly alleges that "[s]he did not seek a reasonable accommodation for" those impairments in 2004.  Dkt. 53 at 29 (Third Am. Compl. ¶ 183).

the Rehabilitation Act). Under that framework, even in the absence of direct evidence of discriminatory intent, a plaintiff may establish a prima facie case of intentional discrimination by showing that (1) she is a member of "a protected class" under Title VII or the Rehabilitation Act; (2) that "she suffered a cognizable adverse employment action;" and (3) "[that] the action gives rise to an inference of discrimination." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113–14 (D.C. Cir. 2016) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015)). If the plaintiff establishes a prima facie case, "the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its action." *Id.* at 1114. "If the employer does [so], the burden then shifts back to the plaintiff, who must be afforded a fair opportunity to show that the employer's stated reason for its actions was in fact pretext for unlawful discrimination." *Id.*

Like many legal frameworks, the *McDonnell Douglas* framework comes with exceptions and refinements. To start, the D.C. Circuit has recognized that the framework, in essence, falls away once an employer carries its burden of coming forward with a legitimate, non-discriminatory reason for its action. *Brady v. Office of Sergeant at Arm*s, 520 F.3d 490, 493–94 (D.C. Cir. 2008). That is, once the employer articulates "a legitimate, non-discriminatory reason" for its action, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case" and, instead, should decide only whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race" or disability. *Id.* at 494.

This refinement, however, only goes so far. As the D.C. Circuit has recently advised, the Court should not "rush to the third prong" of the framework without first ensuring that the employer has made an "'adequate' evidentiary proffer" under the second prong. *Figueroa v.*

*Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (citation omitted).  In particular, before concluding that the employer has carried its burden under the second prong, the Court must consider (1) whether the employer has "produce[d] evidence that a factfinder may consider at trial (or a summary judgment proceeding);" (2) whether that evidence is sufficient to permit a reasonable jury "to find that 'the employer's action was motivated by' a non-discriminatory reason;" (3) whether the proffered, non-discriminatory reason is "facially 'credible' in light of the proffered evidence;" and (4) whether the evidence "present[s] a 'clear and reasonably specific explanation.'"  *Id.* at 1087–88 (citations omitted).  Most notably, it is not enough for an employer merely to assert in vague or conclusory terms that it hired or promoted the most qualified candidate for the position.  *Id.* at 1088–92.

Finally, in evaluating a motion for summary judgment, the Court must also bear in mind that Title VII and the Rehabilitation Act employ different causation standards.  Under Title VII, a plaintiff asserting "a status-based discrimination" claim "need not show that the causal link between injury and wrong [was] so close that the injury would not have occurred but for the act." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).  Instead, "[i]t suffices . . . to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Id.*; *see also* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B).  Under the Rehabilitation Act, in contrast, a plaintiff asserting a disparate treatment claim must show that the alleged discriminatory conduct was the "but-for" cause of the asserted injury.  *See Gard v. U.S. Dep't of Educ.*, 752 F. Supp. 2d 30, 35–36 (D.D.C. 2010), *aff'd*, No. 11-5020, 2011 WL 2148585 (D.C. Cir. May 25, 2011); *Von Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015).  That is because the Rehabilitation Act, unlike Title VII, bars discrimination "solely by reason of" the employee's protected status.  29

U.S.C. § 794(a).  *Cf.* 42 U.S.C. § 2000e–2(m) (providing that an "an unlawful employment

practice is established" when the discriminatory animus was "a motivating factor").

Applying this framework in the context of this case is no easy task because Plaintiff

combines a hodgepodge of allegedly adverse actions—running the gamut from modest slights to

failure to promote and, ultimately, termination—that CBP allegedly took based on a variety of

protected classifications (sex, race, and disability) in a single count of her third amended

complaint.  *See* Dkt. 53 at 35–39 (Third. Am. Compl. ¶¶ 225–48).  To complicate matters

further, neither party makes more than passing reference to whether Plaintiff has satisfied her

burden of establishing a prima facie case of intentional discrimination based on sex, race, and/or

disability with respect to any of the asserted acts.  The Department fails to address whether any

of these incidents rises to the level of an adverse employment action, *see Ortiz-Diaz v. U.S.*

*Dep't of Hous. & Urban Dev., Office of the Inspector Gen.*, 867 F.3d 70, 73 (D.C. Cir. 2017)

(plaintiff asserting a disparate treatment claim must show that her employer took some action or

made some decision "affecting the terms, conditions, or privileges" of her employment or

affecting her "future employment opportunities," resulting in some "objectively tangible harm").

*See* Dkt. 61 at 22–33.  And, in her opposition brief, Plaintiff addresses only a handful of the

Department's allegedly unlawful actions and the non-discriminatory rationales the Department

proffers.  *See* Dkt. 70 at 7–13.

Given the sprawling nature of Plaintiff's allegations in Count III, it is difficult to discern

whether each of the incidents alleged in the count is intended to constitute a distinct violation or

whether certain incidents are mentioned only to support Plaintiff's assertion that the remaining,

actionable incidents were taken for discriminatory reasons.  She clarifies this confusion in her

opposition brief, however, in which she homes in on four incidents that she contends form the

basis of her disparate treatment claim: (1) her removal from federal service in 2008, Dkt. 70 at 8–10; (2) the denial of her 2006 request for telework accommodations, *id.* at 10; (3) her preclusion from applying for the acting Deputy Director detail in 2005, *id.* at 11–12; and (4) the Department's determination that she was not qualified to perform the industrial hygienist position with or without accommodations, *id.* at 12. Because Plaintiff says nothing about the other incidents referenced in Count III,[10] the Court understands her disparate treatment count to rise or fall based on whether the Department is entitled to summary judgment with respect to the four incidents she addresses in her brief. The Court will take each of these incidents in turn.

  a.  <u>2008 Removal from Federal Service</u>

  Of the incidents alleged in Count III, Plaintiff devotes the most attention in her opposition brief to her claim that the Department unlawfully removed her from federal service in 2008. *See* Dkt. 70 at 7–10. The Department contends that it removed Plaintiff from federal service for two legitimate, non-discriminatory reasons. Dkt. 61 at 25. First, the Department contends that she "fail[ed] to perform the responsibilities of the [MPS] position" despite the Department's provision of multiple "work adjustments," including specialized equipment and

---

[10] It is perhaps unsurprising that Plaintiff homes in on these four actions and omits the remaining incidents. Several courts in this circuit have held that incidents similar to those that she alleged in her complaint but omitted from her opposition brief do not rise to the level of actionable adverse actions. *See, e.g.*, *Johnson v. Bolden*, 699 F. Supp. 2d 295, 299 (D.D.C. 2010) (concluding that plaintiff failed to establish an adverse action where plaintiff offered no evidence that exclusion from work meetings had a tangible impact); *Brookens v. Solis*, 616 F. Supp. 2d 81, 91 (D.D.C. 2009) (noting that "the D.C. Circuit has held that the denial of a detail does not constitute an adverse action" (citation omitted)); *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (concluding that an employer's requirement that the employee "submit biweekly reports on the status of her work" did not rise to the level of an adverse employment action); *Medina v. Henderson*, No. 98-5471, 1999 WL 325497, at *1 (D.C. Cir. Apr. 30, 1999) ("Absent extraordinary circumstances not present here, a purely lateral transfer does not amount to an adverse employment action.").

training.  *Id.*; *see also* Dkt. 61-3 at 204–05 (Def. Ex. 47).  Second, the Department argues that Plaintiff was terminated for a lack of candor because, according to the Department, during the same period that Plaintiff claimed that she could not type due to her carpal tunnel syndrome, she sent over 500 non-work-related emails.  Dkt. 61 at 26; Dkt. 61-3 at 205 (Def. Ex. 47).

In response, Plaintiff concedes that she failed to perform work assigned to her in the MPS position, *see* Dkt. 61 at 9 (SUMF ¶¶ 67–68); Dkt 70 at 26 (Response to SUMF ¶¶ 67–68), but she blames that failure on her carpal tunnel syndrome and the Department's alleged failure to accommodate her condition, *see* Dkt. 70 at 9; *accord* Dkt. 61-3 at 95–96 (Def. Ex. 47).  And, with respect to the Department's lack-of-candor rationale, she argues that the argument fails because the Department's evidence does not "satisfy the best evidence test" and because the Department has offered no evidence that Plaintiff did anything more than "type a few words before forwarding [the alleged] emails to other persons."  Dkt. 70 at 9–10.

To the extent Plaintiff contends that she was removed from federal service because she suffered from carpal tunnel syndrome, in violation of the Rehabilitation Act, the Court has already held that Plaintiff's claim fails at the threshold.  "Proving that the plaintiff was disabled within the meaning of the Rehabilitation Act in effect at the time [Plaintiff's] claim arose is 'an essential element of [her] case,' and the lack of colorable proof of [that] element 'necessarily renders all other facts immaterial.'"  *Smith v. Lynch*, 106 F. Supp. 3d 20, 45 (D.D.C. 2015) (quoting *Celotex*, 477 U.S. at 323).  As explained above, Plaintiff's carpal tunnel syndrome did not rise to the level of a disability within the meaning of the Rehabilitation Act, as the law existed at the time.  Although under *Brady* "judicial inquiry into the prima facie case is usually misplaced," *Brady*, 520 F.3d at 493, it is "not always irrelevant" and there are times a plaintiff must establish certain 'threshold' issues in order to survive a motion for summary judgment.

*Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 258 (D.D.C. 2017). Because Plaintiff's carpal tunnel syndrome was not, at the relevant time, a disability within the meaning of the Rehabilitation Act, *see supra* Part III.A.2, her associated disparate treatment claim arising from her termination in 2008 must fail.

In any event, whether framed as a claim of disability discrimination or race or sex discrimination, Plaintiff's claim would still fail. The Department has offered legitimate, non-discriminatory reasons for her termination and has satisfied its burden of production under *Figueroa*. The Department has offered uncontroverted evidence that Plaintiff was assigned the duty of developing a new "WEBTele user guide," Dkt. 61-3 at 51 (Def. Ex. 41), and that, almost three-months after having been assigned that project, Dkt. 61-3 at 182 (Def. Ex. 45), Plaintiff's only work product was a single-page document consisting of handwritten bullet points. Dkt. 61-3 at 150 (Def. Ex. 44); *see also* Dkt. 70 at 26 (Response to SUMF ¶ 65). It has also offered evidence that it analyzed Plaintiff's hard-drive and discovered that she sent over 500 non-work-related emails during the time she claimed to be unable to perform typed work. *Compare* Dkt. 61-3 at 207 (Def. Ex. 47), *and* Dkt. 61-3 at 153 (July 13, 2007 email from Plaintiff asserting that she was "not physically able to use a keyboard, without exacerbation of [her] . . . carpal tunnel syndrome"), *with* Dkt. 61-3 at 122–31 (Def. Ex. 42) (listing hundreds of emails sent from Plaintiff's work computer between March and September 2007).[11] Under *Figueroa*, a factfinder

---

[11] The only evidentiary objection Plaintiff raised regarding the 500 emails fails to satisfy "the best evidence test." Dkt. 70 at 9. Even assuming, for present purposes, that the best evidence rule applied at this stage in the proceeding, the Department's evidence does not contravene it. Under Federal Rule of Evidence 1002, a party must produce an original document only if the party is seeking to "prove its content." Here, the Department is not seeking to prove the contents of Plaintiff's emails but, rather, is only seeking to show that she sent them—or more precisely, that CBP legitimately believed that she sent them. *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

could reasonably find from the proffered evidence that the Department was motivated by non-discriminatory and credible reasons; that is, the Department terminated Plaintiff for her failure to perform assigned work and for her lack of candor regarding her ability to perform typed work. *See George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (observing that "performance below the employer's legitimate expectations" is one of the "two most common" "legitimate reasons for discharge"); *Chambliss v. Amtrak*, No. 05-2490, 2007 WL 581900, at *18 (D.D.C. Feb. 20, 2007) (concluding that an employer's assertion that a plaintiff's dishonesty in dealing with management with respect to an alleged injury is a legitimate non-discriminatory reason for termination). These explanations, moreover, are sufficient to "fairly put the plaintiff on notice of what reasoning [she] must challenge." *Figueroa*, 923 F.3d at 1091.

Because the Department has "met all four *Figueroa* factors and proffered legitimate, non-discriminatory reasons, the burden reverts" to Plaintiff, who must "produce sufficient evidence for a jury to reasonably conclude" that the Department's proffered reasons were not the actual reasons and that the agency intentionally discriminated against her on the basis of some protected characteristic. *Holassie v. District of Columbia*, No. 16-cv-2053, 2019 WL 5189005, at *6 (D.D.C. Oct. 15, 2019) (citing *Brady*, 520 F.3d at 495). She has failed to do so. The primary rejoinder Plaintiff offers is that she failed to complete her assigned work due to her carpal tunnel syndrome. Dkt. 70 at 8–9. But even accepting that claim as true, the Department is still entitled to summary judgment as to the 2008 termination. Given that her carpal tunnel was not a disability, the Department was under no duty to accommodate it. Plaintiff, moreover, has offered no evidence that the Department's stated reasons were pretextual and that the actual reason she was terminated was because of her sex, or race.

Plaintiff's remaining argument, that the Department was mistaken about her lack of candor, Dkt. 70 at 9–10, "misunderstands the relevant factual issue." *Brady*, 520 F.3d at 496. The relevant consideration is not "the correctness or desirability of the reasons offered," *Fischbach*, 86 F.3d at 1183, but "whether the employer honestly and reasonably believed the reason it offere[s]," *Brady*, 520 F.3d at 486. So long as the employer's "'stated belief about the underlying facts' is 'reasonable in light of the evidence,' there 'ordinarily is no basis for permitting a jury to conclude that the employer is lying about' those facts." *McCullough v. Whitaker*, No. 14-296, 2019 WL 171404, at *7 (D.D.C. Jan. 8, 2019) (quoting *Brady*, 520 F.3d at 495). Here, the Department's stated belief that Plaintiff lacked candor was reasonable in light of the 500 emails it discovered on the hard drive of her work computer. Although Plaintiff asserts that her employer's belief that she lacked candor was mistaken, she has produced no evidence "show[ing] that the [Department's] conclusion was dishonest or unreasonable." *Brady*, 520 F.3d at 496. Summary judgment for the Department is, therefore, proper.

b.    <u>Acting Deputy Director Opportunity</u>

The other incident to which Plaintiff devotes substantial attention in her opposition brief is her contention that the Department denied her the opportunity to compete for the acting Deputy Director position because of her disability, race, and sex. *See* Dkt. 70 at 11–12. The uncontested evidence shows that Plaintiff asked to be considered to fill the vacant acting Deputy Director position on April 22, 2005 and that McMahen denied that request on May 9, 2005, Dkt. 61-1 at 24–25 (Def. Ex. 4), telling Plaintiff: "[t]he duty station for the [a]cting Deputy Director" position was Indianapolis, Indiana, Dkt. 61-2 at 5 (Def. Ex. 19); there were enough interested candidates in the Safety Branch's Indianapolis office; as a result, "only Indianapolis-based employees [would] be detailed to the position;" and "travel expenses would not be authorized for

employees outside the [Indianapolis] commuting area," Dkt. 61-1 at 25 (Def. Ex. 4). Finally, the uncontested evidence shows that the opportunity to serve as the acting Deputy Director provided an important steppingstone to obtaining the permanent Deputy Director position. *See, e.g.*, Dkt. 61-2 at 5 (Def. Ex. 19). Indeed, the permanent position was ultimately filled by McKeighan after he had served as one of the rotating acting Deputy Directors. *See* Dkt. 61-1 at 77 (Def. Ex. 8).

Under *Figueroa*, 923 F.3d at 1087–88, this evidence is sufficient to satisfy the second prong of the *McDonnell Douglas* test. The Department has produced evidence that a jury could consider at trial, *see* Dkt. 61-1 at 25 (Def. Ex. 4); Dkt. 61-2 at 5 (Def. Ex. 19); that evidence would permit a reasonable jury to find that CBP was motivated by a non-discriminatory rationale; the stated non-discriminatory reason is "facially credible in light of the proffered evidence;" and "the evidence . . . present[s] a clear and reasonably specific explanation." *Figueroa*, 923 F.3d at 1087–88 (quotations omitted). As a result, the Court "need not—and *should not*—decide whether [P]laintiff actually made out a prima facie case under *McDonnell Douglas*," *Brady*, 520 F.3d at 494, and should decide, instead, whether Plaintiff has "produced sufficient evidence for a reasonable jury to find that [CBP's] asserted non-discriminatory reason was not the actual reason and that [CBP] intentionally discriminated against [her] on a prohibited basis," *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (citing *Brady*, 520 F.3d at 493–95); *see also Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014).

In her opposition brief, the principal evidence of pretext that Plaintiff points to is found in an unsworn "affidavit" of Arthur Murphy, a CBP contractor who McMahen supervised, which Murphy submitted in the course of the EEO investigation of Plaintiff's allegations.[12] *See* Dkt. 70

---

[12] Plaintiff's opposition brief addressed the question of whether the Department's proffered non-discriminatory rationale is pretextual in a single paragraph, which states:

at 13.  Given the significance of this statement, the Court will quote the relevant passages at

length:

> Mr. McMahen told me that he was going to let [Plaintiff] work at home, [but] I heard him make comments to the contrary to other employees in Indianapolis. Whenever her name came up in Indianapolis, he would comment that she was "lazy" and did not do any work.  He had open disdain for her because of her injuries[,] which I found very strange[] because I had encountered the same attitude when I was ill or hurting.  I heard him say that she was "typical of her race, trying to get something for nothing," and that he was not going to let her work from home.
>
> . . . .
>
> Mr. McMahen had a total lack of sympathy or empathy for anyone with a health problem . . . .
>
> . . . .
>
> In relation to Ms. Kirkland's situation, I heard Mr. McMahen say that he was going to run her out of the Agency[,] and [she] should would not have a job.  He is an extremely prejudiced person and . . . he made comments to the effect that she was lazy and "typical of her race."  I also once heard him say that they "have a nigger in the woodpile" when referring to Ms. Kirkland.
>
> Mr. McMahen reminds me of Archie Bunker.  He used the "n" word on several occasions when speaking about Ms. Kirkland and two other African-American employees.  One of those employees was in a wheelchair, and I heard Mr. McMahen say that the employee was worthless and only had a job because he was black. . . .
>
> Mr. McMahen is a bully who walks around picking on people.  He is a tyrant who likes to keep his whole staff terrified of him. . . .  If he does not like something about you, he will do everything he can to make your life miserable.

---

> Because Art Murphy will testify under oath as to what Gary McMahen said to him about Ms. Kirkland, summary judgment is not appropriate.  Because McMahen because testy [sic] with Plaintiff, and decided he did not want Plaintiff working for him only immediately, after she requested a reasonable accommodation, the Court should find that sufficient evidence would enable a reasonable jury to find that the Agency's asserted non[-]discriminatory reasons were not the actual reasons for its decisions, and that the Defendant intentionally discriminated against her.

Dkt. 70 at 13.

Dkt. 61-3 at 233–37 (Def. Ex. 51).

Murphy's "affidavit," if accepted as true, would be probative of McMahen's "discriminatory attitude," both because the statements were, according to Murphy, part of a pattern of behavior and because at least some of those statements were "targeted directly at the plaintiff." *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016) (collecting cases). McMahen's alleged statements reflect a discriminatory bias as to both race and disability. Although the Department counters that it "investigated the[se] serious allegations [and] found no corroborating evidence or testimony," Dkt. 61 at 33 (citing Dkt. 61-3 at 242–49 (Def. Ex. 52)), and although Murphy had separate reasons to be angry at McMahen, *see*, Dkt. 61-3 at 234–35 (Def. Ex. 51) (Murphy describing his personal grievances against McMahen), it is not the Court's role to resolve genuine disputes of fact at the summary judgment stage, *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 173 (D.D.C. 2016).

The problem, however, is that Murphy's unsworn "affidavit," *see* Dkt. 61-3 at 230–40 (Def Ex. 51), is not competent evidence upon which Plaintiff can rely. As explained above, Plaintiff bears the burden of showing that a reasonable jury could find that the Department—or one of its employees—was motivated by discriminatory animus, which here means that Plaintiff must establish a genuine dispute of fact by "citing to particular parts of the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The opposing party—here, the Department—"may object that the material cited to support or

dispute a fact cannot be presented in a form that would be admissible at trial," Fed. R. Civ. P. 56(c)(2), although the Court may consider objectionable material "if not challenged," *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 37 (D.C. Cir. 1987) (quoting Wright & Miller, Federal Practice & Procedure § 2722 (2d ed. 1983)).  Plaintiff's submission fails this test.

Although captioned as an "affidavit," Murphy's statement is unsworn and contains no affirmation that it was offered under the penalty of perjury.  On this basis, the Department argues in its reply brief that the statement is "inadmissible" and thus cannot "preclude summary judgment."[13]  Dkt. 77 at 7.  As an initial matter, the Court notes that the Department cannot be faulted for raising this objection only in its reply brief.  Having carried its burden of proffering legitimate, non-discriminatory rationales for the actions at issue in its opening brief, the burden shifted from the Department to Plaintiff to offer some evidence of pretext in her opposition.  The only response she has offered is that the discriminatory statements McMahen allegedly made to Murphy are evidence of pretext.  *See* Dkt. 70 at 13.  Notably, the only evidence that McMahen made those statements is Murphy's unsworn "affidavit."  *See* Dkt. 61-3 at 236–37.  Yet Plaintiff's opposition brief offers no reason why the Court should consider an unsworn "affidavit," *see* Dkt. 70, even though Defendants at least alluded to this difficulty in their opening brief, *see* Dkt. 61 at 33, and, more importantly, Plaintiff has not sought leave to file a sur-reply addressing this important issue.

The question for the Court, then, is whether an unsworn statement, even if captioned as an "affidavit," provides sufficient basis to preclude summary judgment.  For several reasons, the

---

[13]  The Department also objects to Plaintiff's reliance on Murphy's statement on the grounds that it cites hearsay.  Dkt. 77 at 7.  For present purposes, the Court need not reach that (more dubious) objection.

Court concludes that it does not. The answer to this question starts with the Supreme Court's decision in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), which held that a party opposing summary judgment need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment" but must ordinarily offer "the kinds of evidentiary materials listed in Rule 56[.]" *Id.* at 324. Although that list was expanded when Rule 56 was amended in 2010, the principle announced in *Celotex* remains sound.

As currently constituted, that list includes "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). If Murphy's statement was, in fact, an affidavit, that would bring it within the ambit of the rule. But, as the Sixth Circuit has noted, an unsworn "affidavit" is "a contradiction in terms." *Sfakianos v. Shelby County Gov't*, 481 Fed. Appx. 244, 245 (6th Cir. 2012) (citing *Mason v. Clark*, 920 F.2d 493, 495(1990)). An affidavit, by definition, is "[a] voluntary declaration of facts written down and *sworn to by a declarant*." Affidavit, Black's Law Dictionary (11th ed. 2019) (emphasis added). Because Murphy's statement is not sworn to by the "declarant," it is not an affidavit within the meaning of Rule 56. Likewise, the statement does not qualify as a "declaration." Under 28 U.S.C. § 1746, an unsworn declaration may be used in lieu of a sworn affidavit if it is "subscribed" to by the declarant "as true under the penalty of perjury" and if it follows the prescribed format. *See also* Fed. R. Civ. P. 56(c), advisory committee note of 2010 (noting that a "written unsworn declaration," can "substitute" for an affidavit if it satisfies 28 U.S.C. § 1746); 11 Moore's Federal Practice § 56.94 (2019) ("Declarations were added in the 2010 amendments to Rule 56 in recognition of the fact that, under 28 U.S.C. § 1746, a written unsworn declaration . . . may be

substituted for an affidavit").  Here, again, Murphy's unsworn statement lacks the indicia of reliability required by the rule.

Nor is the Court persuaded that the Murphy "affidavit" otherwise qualifies as the "kind of evidentiary material listed in Rule 56."  *Celotex Corp.*, 477 U.S. at 324.  Only two other possibilities come to mind: it might qualify as a "document" or as "other materials" within the meaning of Rule 56(c)(1)(A).  But reading Rule 56 in that manner would deprive the phrase "affidavits or declarations" of any practical meaning—indeed, on that view, Rule 56 could simply refer to "documents" and "other materials," without any mention of the other types of evidentiary material listed in the rule.  That result would violate the cardinal rule of construction that a court should, if possible, give effect to every word and clause, *see, e.g.*, *Yates v. United States*, 135 S. Ct. 1074, 1086–87 (2015) (applying the canon against surplusage), and it would place courts in the untenable position of either relying on evidentiary material lacking any indicia of reliability or making ad hoc determinations about the reliability of that evidentiary material.  It is far more sensible to defer to the determination made in the text of the Rule itself—testimonial material must be offered under oath (depositions, *see* Fed. R. Civ. P. 30(b)(5)(A)(iv); interrogatories, *see* Fed. R. Civ. P. 33(b)(3); and affidavits) or under the penalty of perjury (declarations, *see* 28 U.S.C. § 1746).

The Court's conclusion is bolstered by Rule 56's further requirement that an affidavit or declaration "be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant would be competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  It would be odd, to say the least, to conclude that Rule 56 requires, for example, that an affiant be competent to testify on a matter, while allowing a party to sidestep that requirement by offering an unsworn statement in lieu of an affidavit or declaration.  And,

finally, the fact that Rule 56 was amended in 2010 to permit consideration of "written unsworn declaration[s], certificate[s], verification[s], or statement[s] subscribed to in proper form as true under the penalty of perjury," Fed. R. Civ. P. 56(c), advisory committee note of 2010, resolves any reasonable doubt regarding the meaning of Rule 56. If courts were permitted to rely on unsworn statements regardless of their form and regardless of whether they were made under the penalty of perjury, the advisory committee's attention to that detail would have been superfluous.

For present purposes, the Court need not decide the precise bounds of when a party may rely on "documents" and "other materials" in opposing summary judgment. It is enough to conclude, as the Court does, that an unsworn "affidavit" is beyond the scope of the "kinds of evidentiary materials" contemplated by Rule 56. As a result, Murphy's statement cannot—at least in its present form—aid Plaintiff in resisting Defendant's motion for summary judgment.

Returning to the question of pretext, Plaintiff's reliance on Murphy's statement is deficient for a second reason: Plaintiff assumes, without evidentiary support, that McMahen was the relevant decisionmaker or that he influenced the decisionmakers in material respects. The evidence before the Court, however, indicates that it was McMahen's supervisor, Nancy Little-McGuire, not McMahen, who made the decision to limit the Deputy Director opportunity to Indianapolis-based employees. *See* Dkt. 61-1 at 25 (Def. Ex. 4). Although McMahen conveyed that restriction to Plaintiff, the Department has offered uncontroverted evidence that he merely communicated the restriction set by Little-McGuire. *Id.*; *id.* at 10 (stating that Little-McGuire was McMahen's immediate supervisor at the relevant time); *see also* Dkt. 61-2 at 5 (Def. Ex. 19) (McMahen's email communicating the restriction to Plaintiff). Plaintiff offers no competent evidence that McMahen influenced Little-McGuire's decision to limit the Deputy Director opportunity to Indianapolis-based employees, or evidence that might call into question whether it

was Little-McGuire who imposed the restriction.[14]  Thus, on the present record, McMahen's statements reported in Murphy's unsworn "affidavit" are not relevant to the question of whether the Department's stated reason is pretextual.

Aside from Murphy's unsworn "affidavit," the only other evidence of pretext that the Plaintiff offers is her contention that the Department enforced the Indianapolis-based-employee requirement arbitrarily.  *See* Dkt. 70 at 11.  In particular, she argues that another industrial hygienist employed by the Safety Branch, Eric McQueen, was selected to serve as one of the rotating acting Deputy Directors, even though he lived sixty miles outside of Indianapolis.  *Id.* This is probative, according to Plaintiff, because the Office of Personnel Management regulations permit agencies to "prescribe a mileage radius of not greater than 50 miles to determine whether an employee's travel is within or outside the limits of the employee's official duty station for determining entitlement to overtime pay for travel."  5 C.F.R. § 551.422(d).  The Court is unpersuaded.  The regulation's 50-mile radius is only for the purpose of determining overtime pay and has no bearing on whether the Department may hire personnel who currently reside outside that radius.  Moreover, the explanation offered by the Department was not that she was beyond that 50-mile radius, but rather that the opportunity was available only to Indianapolis-based employees and that the Department was unwilling to pay travel expenses "for

---

[14]   That is not to say that Plaintiff could not do so.  Evidence in the record shows that "McMahen denied making any of the comments attributed to him by" Murphy.  Dkt. 61-3 at 245 (Def. Ex. 52).  If there was a genuine factual dispute whether McMahen made that those comments, then McMahen's denial might establish a genuine dispute as to whether McMahen's testimony on other questions of fact was truthful.  Plaintiff, however, has offered no *competent* evidence that might give rise to such an inference, nor did Plaintiff ever seek to depose Little-McGuire or otherwise to controvert McMahen's testimony that Little-McGuire set the policy.  Absent *any* evidence that might controvert McMahen's statement—submitted under penalty of perjury—no reasonable jury could find that McMahen, and not Little-McGuire, decided to limit the acting Deputy Director detail to Indianapolis-based employees.

employees outside the Indianapolis commuting area." Dkt. 61-2 at 5 (Def. Ex. 19). Unlike Plaintiff, McQueen was an Indianapolis-based employee, Dkt. 61-1 at 38 (Def. Ex. 4) ("Eric McQueen, an industrial hygienist in Indianapolis"), and he lived close enough to Indianapolis—regardless of whether his home was fifty or sixty miles away—to work at the designated duty station without imposing any additional costs on CBP.

In sum, Plaintiff has failed to proffer evidence that would permit a reasonable jury to find that she was excluded from the acting Deputy Director opportunity based on discriminatory animus, rather than neutral criteria set by an unbiased supervisor. *See Hampton v. Vilsack*, 685 F.3d 1096, 1101 (D.C. Cir. 2012) (finding that racial animus of an employee not tied to the ultimate employment decision, with no evidence that the animus affected the decision, was insufficient to defeat a motion for summary judgment). Nor has Plaintiff proffered evidence that would permit a reasonable jury to find that McMahen implemented the neutral restriction in a discriminatory manner.

Accordingly, the Court will grant summary judgment as to Plaintiff's claim based on her exclusion from the acting Deputy Director detail opportunity.

c.      Disqualification from the Industrial Hygienist Position

Plaintiff also relies on her disqualification from the industrial hygienist position. Dkt. 70 at 12–13. The most plausible way to read this claim, however, is that it is the same claim as Plaintiff's failure-to-accommodate claim. Indeed, the parties treat it as such, focusing solely on the question whether Plaintiff could perform the essential functions of the industrial hygienist position with or without reasonable accommodation. *See* Dkt. 61 at 31–33; Dkt. 70 at 12–13. Construing the claim in this manner, the Court's conclusion as to the failure-to-accommodate, *see supra* Part I.A, controls here.

To the extent Plaintiff intends to press a separate disparate treatment claim based on the same underlying facts as her failure-to-accommodate claim, that effort fails. Because Plaintiff has not articulated how the disqualification constituted disparate treatment, the Court can only speculate. The claim is susceptible of two interpretations.

One possibility is that the decision to disqualify her was motivated by her status as a person with a disability. But, if that is Plaintiff's theory, the claim melds with her failure-to-accommodate claim. The *McDonnell Douglas* framework is intended to provide an employee "'with a full and fair opportunity to attack the' [employer's stated] explanation as pretextual." *Figueroa*, 923 F.3d at 1088 (quoting *Lanphear v. Prokop*, 703 F.2d 1311, 1316 (D.C. Cir. 1983)). But, here there is no pretext about why the Department disqualified Plaintiff from the position: The Department asserts that it disqualified her from the position "by reason of" her disability. 29 U.S.C. § 794; *see* Dkt. 61 at 31; Dkt. 61-2 at 27–29 (Def. Ex. 24) (notifying Plaintiff that the Department had determined that her disability precluded her from performing the essential functions of the industrial hygienist position); *see also Barth v. Gelb*, 2 F.3d 1180, 1185–89 (D.C. Cir. 1993) (holding that where the employer concedes that disability played a role in its employment decision, the *McDonnell Douglas* principles are inapposite, and the appropriate focus is on the question whether the employee's disability could be reasonably accommodated); *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1180 (6th Cir. 1996) (holding that, when the employer acknowledges that it relied upon plaintiff's disability, the "*McDonnell Douglas* burden shifting approach is unnecessary," and instead the determinative disputed issue is "whether the employee is 'otherwise qualified,' with or without reasonable accommodation, to perform the job"), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012). As a result, the only question the parties

dispute is whether that determination violated the Department's statutory obligation to provide a reasonable accommodation. *See, e.g.*, Dkt. 70 at 12–13 (arguing that Plaintiff could perform the essential functions of the position with a reasonable accommodation); *see also* 42 U.S.C. § 12112(b)(5)(A) (requiring covered entities, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability). That is, the only question is whether the Department should have, but did not, accommodate Plaintiff's disability. That question, however, merely duplicates the question presented by Plaintiff's failure-to-accommodate claim.

Another possible theory is that Plaintiff claims that the decision to disqualify her was motivated by animus based on some other protected characteristic, such as race, sex, or age. But if that is Plaintiff's theory, it suffers from the same flaws as her acting Deputy Director claim: The only evidence of discriminatory animus she has offered are the discriminatory statements allegedly made by McMahen. *See* Dkt. 70 at 13. Those alleged statements are neither supported by competent evidence nor probative of the motivation of the relevant decisionmaker. The uncontroverted evidence shows that it was Secretary Chertoff who, in consultation with CBP's Office of Equal Employment Opportunity, determined that Plaintiff could not perform the essential functions of the industrial hygienist position with or without accommodations. Dkt. 61-1 at 62–67 (Def. Ex. 7). Plaintiff has offered no evidence that McMahen influenced or otherwise had any involvement in Secretary Chertoff's decision. And while reasonable minds might differ as to whether Secretary Chertoff's decision was correct, *see supra* Part I.A, Plaintiff cannot bootstrap that failure-to-accommodate issue into a separate disparate treatment claim without *any* competent evidence of pretext or animus.

d.     2006 Request for Accommodation

This leaves only Plaintiff's claim that her 2006 request for telework accommodation was denied based on discriminatory animus. As to this incident, the Department's proffered non-discriminatory rationale is that Plaintiff was new to the MPS position and, as a result, her supervisor, Koh, did not wish to grant the telework request until a baseline of performance had been established. Dkt. 61 at 28. It has, moreover, satisfied its burden of production by supporting that explanation with competent evidence that would allow a reasonable trier of fact to find that the Department was motivated by that stated reason rather than by discriminatory animus. *See Figueroa*, 923 F.3d at 1087–88. The Department has offered a declaration by Koh, under the penalty of perjury, Dkt. 61-3 at 13 (Def. Ex. 39), in which Koh explains that she denied the request because Plaintiff was in "training mode," which meant she did not have a baseline to assess Plaintiff's performance in the new position, *id.* at 20 (Def. Ex. 39). That statement is consistent with the undisputed facts that Plaintiff requested the accommodation within days of starting the position and that the duties of the MPS position differed in significant respects from the duties of Plaintiff's previous position. Dkt. 61 at 7 (SUMF ¶ 52); Dkt. 70 at 24 (Response to SUMF ¶ 52); Dkt. 61-3 at 19–20 (Def. Ex. 39). Considering these circumstances, the Department's stated reason is "facially credible," *Figueroa*, 923 F.3d at 1088, and the burden thus shifts to Plaintiff to offer evidence that the Department's stated reason is pretextual. She has failed to do so.

The only response Plaintiff musters is that, because she was "an employee with thirty years of Federal employee experience," including three years with the Department, she "was not a 'new employee' who deserved to be micromanaged and treated as though she were on probation.'" Dkt. 70 at 10 n.6. Plaintiff makes no effort, however, to connect her qualm with

being treated as a "new employee" (which she was for the MPS position) to *any* evidence of discrimination. She has not, for example, offered any comparator evidence that similarly situated employees were treated better than her. *See McGill v. Munoz*, 203 F.3d 843, 848 (D.C. Cir. 2000) (holding that an employer was entitled to summary judgment where the plaintiff failed to offer evidence of disparate treatment). Although her complaint alleges that the Department offered telework accommodations to other CBP employees, *see* Dkt. 53 at 37 (Third Am. Compl. ¶ 241), Plaintiff offers no evidence, as she must at this stage, to support that allegation. *See* Fed. R. Civ. P. 56(c)(1) (requiring that, at the summary judgment stage, a party asserting that a fact is genuinely disputed support that assertion with competent evidence). "[A]bsent some evidence of pretext, it is not the role of the Court to act as a 'super-personnel department that reexamines' the merits of an entity's personnel decisions." *Dyer v. McCormick & Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 228 (D.D.C. 2017). The Court will grant summary judgment as to this claim.

*     *     *

Despite the Court's conclusion that Plaintiff's disparate treatment claims all fail, the Court recognizes that the discriminatory statements allegedly made by McMahen raise the troubling possibility that he harbored animus based on Plaintiff's race and disability; that he expressed that animus using "probably the most offensive word in English," *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (quoting Random House Webster's College Dictionary 894 (2d rev. ed. 2000)); and that certain actions he took were motivated by that "discriminatory attitude," *see Morris*, 825 F.3d at 670. Under the present circumstances, where Plaintiff alleges that a supervisor made discriminatory statements, where Defendant, in its reply brief, has lodged an appropriate objection to the evidence Plaintiff

proffered in support of that allegation, and where Plaintiff has not filed any response shoring up that evidentiary lacuna, the Court is inclined to close the door on Plaintiff's disparate treatment claims, but not to turn the latch. The Court will allow Plaintiff the opportunity to seek reconsideration of its grant of summary judgment with respect to the claims involving McMahen within thirty days, *on the condition* that she support her motion with a sworn affidavit, declaration, or other *competent* evidence supporting her contention that McMahen made the asserted discriminatory statements to Murphy. *See* Fed. R. Civ. P. 56(e)(4) (providing that where a party "fails to properly support an assertion of fact" a court may "issue any . . . appropriate order"). In this respect, the Court notes that the Department apparently asked Murphy to attest to the truth of his statements and, according to the Department, he declined to do so. Absent some evidence of the type contemplated by Rule 56, the Court has no reason to believe that Murphy's statement could later be presented in a form that is admissible at trial and thus will not entertain a motion for reconsideration that is not supported by appropriate evidence. *See* Fed. R. Civ. P. 56(c)(2), advisory committee note of 2010 ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

2. *Retaliation Claims*

In Counts V and VI, Plaintiff asserts two retaliation claims—one under the Rehabilitation Act, Dkt. 53 at 43, and the other under the Age Discrimination in Employment Act, *id.* at 50.[15] Count V of Plaintiff's third amended complaint alleges that CBP retaliated against her in a

---

[15] Plaintiff also alleges retaliation in violation of the Americans with Disabilities Act ("ADA"). Dkt. 53 at 51–52 (Third Am. Compl. ¶ 341). Because Plaintiff was a federal employee at all relevant times, however, her disability-related claims are governed exclusively by the Rehabilitation Act. *See* 42 U.S.C. § 12111(5) (excluding the federal government from the ADA).

variety of ways for engaging in statutorily protected activities, including contacting an EEO counselor about CBP's failure to accommodate her asserted disabilities as early as February 2005, Dkt. 53 at 44 (Third Am. Compl. ¶ 294), and filing formal EEO complaints in October 2005, *id.* at 47 (Third Am. Compl. ¶ 312), and in early 2006, *id.* at 47–48 (Third Am. Compl. ¶ 317). Among other adverse actions, she alleges that CBP denied her "opportunities for promotion;" "narrow[ed] [her] work responsibilities to those involving painful keyboarding;" transferred her work station from Washington, D.C. to Indianapolis, Indiana and "issu[ed] . . . a determination that she was medically disqualified to serve as a GS-13 Industrial Hygienist;" "suspend[ed] her without pay and medical benefits for seven months, and, finally, demot[ed] her pay and grade to the position of a GS-301-11 Management Program Specialist." *Id.* at 49 (Third Am. Compl. ¶ 327). Count VI, in turn, alleges that CBP retaliated against her for complaining to the agency head, Secretary Chertoff, that she was being mistreated due to her age. *See id.* at 51–52 (Third Am. Compl. ¶ 341). She alleges that the agency retaliated by transferring her from Washington, D.C., to Indianapolis; disqualifying her from her position as an industrial hygienist; suspending her without pay for seven months; and, finally, demoting her in pay and grade to the MPS position. *Id.*

The framework for considering Plaintiff's retaliation claims parallels that governing her disparate treatment claim. In the absence of direct evidence of retaliatory intent, Plaintiff's retaliation claim is governed by the *McDonnell Douglas* framework, *see Solomon*, 763 F.3d at 14, as refined by *Brady* and *Figueroa*. The standards applicable to Plaintiff's disparate treatment and retaliation claims differ, however, in one respect. Both sets of claims require, at the threshold, that Plaintiff identify an adverse action. In the disparate treatment context, an adverse action is one that affects the "terms, conditions, or privileges of employment or future

employment opportunities in an objectively tangible way." *Ortiz-Diaz*, 867 F.3d at 73. In the retaliation context, in contrast, an adverse action is not limited to actions affecting the terms and conditions of employment but also extends to actions that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Even though the adverse action requirement is less demanding in this context, it still does not include "petty slights or minor annoyances." *Id.* Rather, the harm must be "material"—that is, it must produce an objective injury or harm. *Id.*

These distinctions, for present purposes, are of no moment. For, once again, the parties, fail to address the prima facie case or whether each of the allegedly unlawful actions were materially adverse and, instead, focus exclusively on whether CBP had legitimate, non-discriminatory reasons for each of the challenged actions. Because those arguments mirror those discussed in addressing Plaintiff's disparate treatment claims—and, indeed, both the Department and Plaintiff treat the arguments as one-in-the-same—little additional analysis is required. As to Plaintiff's retaliation counts, Plaintiff's sole evidence that the Department's proffered non-discriminatory reasons are pretextual, once again, is Murphy's unsworn "affidavit." *See* Dkt. 70 at 13. The problem, once again, is that Murphy's "affidavit" is neither sworn nor in a form specified in 28 U.S.C. § 1746. The Court, accordingly, will grant Defendant's cross-motion for summary judgment as to Count V but, for the reasons discussed above, will allow Plaintiff the opportunity to seek reconsideration if she can support Murphy's statement with the type of evidence contemplated by Rule 56.

This reservation, however, is not warranted as to Count VI. In that count, Plaintiff alleges that she was retaliated against for raising an accusation of age discrimination. She

alleges that the Department (i) transferred her industrial hygienist position to Indianapolis and, when she refused to go, (ii) removed her from that position because she wrote a letter to Secretary Chertoff complaining of age discrimination. *See* Dkt. 53 at 50–52 (Third Am. Compl. ¶¶ 329–42). Murphy's unsworn "affidavit" has no bearing on this claim. Because the Department has offered legitimate, non-retaliatory reasons for each of the challenged actions, Plaintiff must offer some evidence of pretext and some evidence that the actual reasons were retaliatory. She has failed to do so.

As an initial matter, the undisputed evidence shows that the Department informed Plaintiff that she was being reassigned to Indianapolis before she wrote the letter to Secretary Chertoff. *Compare* Dkt. 61-1 at 79 (Def. Ex. 8) (noting that Plaintiff mailed her letter to Secretary Chertoff on March 9, 2006), *and* Dkt. 53 at 50 (Third Am. Compl. ¶334) (same), *with* Dkt. 61-1 at 26 (Def. Ex. 4) (noting that Plaintiff was informed that she was being reassigned to Indianapolis on February 22, 2006). Given this chronology, no reasonable jury could find that the Department transferred her in retaliation for writing that letter. Nor can she rely on the Department's decision to remove her from the industrial hygienist position, which occurred more than eight months after she wrote the letter. *Compare* Dkt. 61-2 at 24 (Def. Ex. 24) (letter dated November 8, 2006, *with* Dkt. 61-1 at 79 (Def. Ex. 8) (noting that Plaintiff mailed her letter to Secretary Chertoff on March 9, 2006). Because a significant gap in time occurred between the letter and the disqualification, no reasonable juror relying on temporal proximity alone could conclude that—on the facts of this case—the disqualification was in retaliation for the letter. *See Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("[P]ositive evidence beyond mere [temporal] proximity [between the protected activity and alleged retaliatory action] is required to defeat the presumption that the proffered explanations are genuine."). And, Plaintiff has failed to

offer any other evidence from which a reasonable jury could infer that the Department removed her from the industrial hygienist position in retaliation for her letter to Secretary Chertoff.

Accordingly, the Court will grant the Department's motion for summary judgment as to Count VI.

## C.     Hostile Work Environment

Finally, Count IV of the third amended complaint alleges that Plaintiff was subjected to a hostile work environment, apparently based on the same conduct that forms the basis for her failure-to-accommodate, discrimination, and retaliation claims. *See* Dkt. 53 at 39–42 (Third Am. Compl. ¶¶ 255–79). The standard for determining whether a hostile work environment exists includes both subjective and objective components. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21–22 (1993). The objective component requires examination of the totality of the circumstances, including "the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The bar for demonstrating a hostile work environment is a high one and cannot be based on "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotations omitted). As to the subjective component, a plaintiff cannot establish a hostile work environment if she did not "subjectively perceive the environment to be abusive." *Id.* at 21–22. "Conduct that a plaintiff did not know about, therefore, cannot be used to establish that they were subjected to a hostile work environment." *Hutchinson v. Holder*, 815 F. Supp. 2d 303, 321 (D.D.C. 2011) (citing *Weger v. City of Ladue*, 500 F.3d 710, 736 (8th Cir. 2007); *Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000); *Hirase-Doi v. U.S. W. Comm., Inc.*, 61 F.3d 777, 782 (10th Cir. 1995)).

The Department, in its motion for summary judgment, argues that Plaintiff cannot establish a hostile work environment claim for three reasons. First, it asserts that McMahen's alleged racist statements are not relevant to Plaintiff's hostile work environment claim both because there is no evidence that Plaintiff was contemporaneously aware of the statements and because Plaintiff failed to exhaust her remedies as to the alleged racist statements by McMahen. Dkt. 61 at 34, 34 n.6.[16] Second, it contends that, to the extent Plaintiff premises her hostile work environment claim on the same discrete employment actions that form the basis of her disparate treatment claim, such "actions are not properly part of [her] hostile work environment claim." Dkt. 61 at 35–36. Third, it argues that what remains, then, are only a "few allegations of unrelated management actions," none of which independently or collectively are "so severe and pervasive as to create" a hostile work environment. *Id.* at 36.

Plaintiff, in her opposition, fails to oppose any of Defendant's arguments as to the hostile work environment claim—indeed, her opposition brief wholly omits any mention of her hostile work environment claim. When a nonmovant fails to respond to a motion for summary judgment, the Court must, prior to granting the motion, nevertheless "satisf[y] itself that the record and any undisputed material facts justify granting summary judgment." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir. 2016) (citing Fed. R. Civ. P. 56(e)(3)). In conducting this analysis, the Court may "consider [a] fact undisputed if it has not been properly supported or addressed as required by Rule 56(c)." *Id.* (quoting Fed. R. Civ. P. 56(e)(2)). Although it is unclear whether those principles apply to the present context, where, a plaintiff

---

[16] Given the Court's conclusion that McMahen's statements are not pertinent to Plaintiff's hostile work environment claim, the Court need not address the Department's exhaustion argument. Moreover, for similar reasons, the Court need not repeats its discussion of the evidentiary issues relating to Murphy's "affidavit."

files an opposition brief but fails to address certain claims, the Court will, out of an abundance of caution, consider whether the Department's motion for summary judgment is well-founded.[17]

As an initial matter, the Department's contention that Plaintiff was not contemporaneously aware of McMahen's alleged discriminatory statements is undisputed. Although Plaintiff alleges that she learned about McMahen's "racist comments in February 2005," Dkt. 53 at 36 (Third Am. Compl. ¶ 232), she has failed to offer any evidence to support that allegation. Moreover, McMahen's alleged racist statements were not among the allegations Plaintiff raised in her January 10, 2006, EEOC Complaint. *See* Dkt. 61-3 at 252–53 (description of issues that formed the basis of Kirkland's January 10, 2006 EEOC hostile work environment complaint); *see also* Dkt. 61 at 34 n.6 (noting the omission of McMahen's statements from Kirkland's 2006 hostile work environment complaint). It stands to reason that, if Plaintiff had known of McMahen's statements as early as February 2005, she would have raised them in her 2006 EEOC complaint, which, among other claims, raised a hostile work environment claim based on other aspects McMahen's behavior. Given the absence of any evidence that Plaintiff was aware of McMahen's alleged statements, the Court agrees that those statements are not pertinent to her hostile work environment claim. *See Hutchinson*, 815 F. Supp. 2d at 321

---

[17] The Court notes that *Winston & Strawn, LLP v. McLean*, 843 F.3d 503 (D.C. Cir. 2016), is not on all fours with this case. That case arose in the context where the non-moving party failed to file any opposition at all. Here, by contrast, Plaintiff has filed an opposition motion, but, either due to litigation strategy or counsel's oversight, failed to oppose certain arguments advanced by Defendant. While it is nonetheless incumbent on the Court to ensure itself that Defendant is entitled to summary judgment on the hostile work environment count, *see* Fed. R. Civ. P. 56(e)(3), it is not the Court's obligation " to do counsel's work, [to] create the ossature for the argument, and put flesh on its bone," *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (internal quotation omitted), nor is the Court eager "to second guess the decisions made by counsel regarding which arguments to counter and which to leave unanswered," *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 191 (D.D.C. 2017).

(refusing to consider conduct of which the plaintiff was not contemporaneously aware in assessing her hostile work environment claim).

As to the discrete employment actions alleged in support of her hostile work environment claim, Defendant is correct that "this jurisdiction frowns on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim." *Thomas v. Securiguard Inc.*, No. 18-0125, 2019 WL 4860947, at *62 (D.D.C. Sept. 30, 2019) (quoting *Mason v. Geithner*, 811 F. Supp. 2d 128, 177 (D.D.C. 2011)). Moreover, and more importantly, where, as here, a "a plaintiff adopts a 'kitchen sink' approach to crafting a hostile work environment claim, and when that approach is challenged, it is incumbent upon her to come forward with some explanation as to how her claim actually works under a hostile work environment theory." *Mason*, 811 F. Supp. 2d at 179, *aff'd*, 492 F. App'x 122 (D.C. Cir. 2012). Plaintiff has offered no such explanation. Nor can the Court discern one from its review of the record. Plaintiff's hostile work environment claim bundles together over a dozen separate incidents that span over several years and involve conduct ranging from minor inconveniences to discrete employment actions. To be sure, a plaintiff may establish the existence of a hostile work environment based on "some discrete acts of discrimination." *Ali v. McCarthy*, 179 F. Supp. 3d 54, 64 (D.D.C. 2016). But a plaintiff "may not combine discrete acts to form a hostile work environment without meeting the required hostile work environment standard." *Brooks v. Grundmann*, 748 F.3d 1273, 1278 (D.C. Cir. 2014) (citations and internal quotations omitted). "To prevail [the plaintiff] must first show that . . . she was subjected to discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Id.* at 1276 (internal citations, quotations, and revisions omitted). Here, Plaintiff does not meet that demanding standard.

The Court, therefore, concludes that the Department is entitled to summary judgment on Count IV.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment, Dkt. 61, is hereby **GRANTED** in part and **DENIED** in part;

Defendant's motion for summary judgment is **GRANTED** as to Counts I, II, IV, VI, IX, X, XI, XII, XIII, and XIV;

Defendant's motion for summary judgment is also **GRANTED** as to Counts III and V. Plaintiff, however, may, consistent with the conditions set out in this memorandum opinion and order, file a motion for reconsideration with respect to these counts on or before January 23, 2020;

Defendant's motion for summary judgment is **DENIED** as to Counts VII, VIII, XV, and XVI.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 23, 2019